James E. PETERSON,
Plaintiff-Appellant,

v.

Harold KENNEDY, Richard A. Berthelsen, and National Football League Players Association, Defendants-Appellees.

No. 84–5788.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 6, 1985.

Decided Sept. 16, 1985.

Joseph A. Yablonski, Yablonski, Both & Edelman, Washington, D.C., Robert Simpson, Rose, Klein & Marias, Los Angeles, Cal., for defendants-appellees.

Edgar Paul Boyko, Robert K. Schraner, Miller, Boyko & Bell, San Diego, Cal., for plaintiff-appellant.

Before GOODWIN, REINHARDT, and WIGGINS, Circuit Judges.

REINHARDT, Circuit Judge:

Appellant James Peterson brought suit against the National Football League Players Association ("NFLPA" or "union") and two of its attorneys, claiming that the union, through the named attorneys, had furnished him with inaccurate advice upon which he detrimentally relied in pursuing a grievance against his ex-ballclub, the Tampa Bay Buccaneers. Peterson appeals from the district court's decisions to grant summary judgment in favor of one of the individually named union attorneys, to issue a directed verdict in favor of the other union attorney, and to grant the NFLPA's motion for a judgment notwithstanding the verdict after the jury had ruled in his favor. We affirm each of the trial court's decisions.

## I. BACKGROUND

### A. *Events Giving Rise to Peterson's Grievance*

James Peterson played college football at San Diego State University. After graduating with a physical education degree in 1973, Peterson was drafted by the Los Angeles Rams of the National Football League (NFL). He played for the Rams until 1976, at which time he was traded to the Tampa Bay Buccaneers.

In the summer of 1976, Peterson signed three separate one-year contracts with Tampa Bay for the 1976, 1977, and 1978 football seasons. Each of the contracts contained a standard clause providing that if Peterson were unable to play professional football because of an injury incurred in the performance of services under that contract, the club would continue to pay him his full salary during the remainder of the contract term. In addition, the club agreed to Peterson's request to include a special "injury protection" clause in the 1977 contract. That clause specified that if Peterson were unable to play football in either 1977 or 1978 because of a football-related injury, he would receive the full salary to which he was entitled for the year or years that the injury prevented him from playing. Each of the contracts also contained a provision authorizing the ballclub to terminate the agreement if, in the opinion of the head coach, Peterson's level of performance was "unsatisfactory" as compared to that of other members of the club's squad of players.

Peterson's contracts incorporated the terms of the collective bargaining agreement entered into between the NFLPA and the NFL Management Council. The collective bargaining agreement contemplated two distinct grievance procedures by which a player could contest a club's decision to terminate his contract. An "injury grievance" was the proper procedure to be employed by a player seeking to enforce a club's contractual obligation to pay his salary when he incurred an injury in the performance of his services under the contract. A "non-injury" grievance was the appropriate means to resolve all other disputes involving the enforcement of a player's contract. An injury grievance was required to be filed within 20 days of the date on which the dispute arose, a non-injury grievance within 60 days of that date. There were also differences with respect to the intermediate procedures applicable to the two classifications of grievances, but the final step in each was a hearing before a neutral arbitrator. A player was authorized to file and process both forms of grievance on his own without any involvement by the NFLPA.

Peterson was injured in the third game of the 1976 football season. He had surgery on his right knee and was sidelined for the rest of the season. The club honored its contractual obligation to pay Peterson's salary over the balance of the 1976

season. After his surgery, Peterson underwent a medically supervised rehabilitation program. He reported to the Tampa Bay pre-season camp in mid-July, 1977. After passing a physical examination administered by the team's physician, Peterson participated fully in all practices and drills during the first seven or eight days of training camp.

The club's records reveal that on July 22, 1977, Peterson was verbally advised that he had been "cut" from the team and placed on waivers. Peterson received written notification that his 1977 and 1978 contracts had been terminated on July 25, 1977.

Peterson believed that he was cut from the team because of reduced mobility attributable to the knee injury that he suffered in the 1976 season. He claimed that, under the "injury protection" clause of the 1977 contract, the club remained obligated to pay him his full salary for both the 1977 and 1978 football seasons. The club disagreed. Its officials told Peterson that he had been released because he lacked sufficient skill to make the team, not because of his knee injury, and that he was therefore not entitled to payment under the "injury protection" clause.

### B. *The Handling of Peterson's Grievance*

At trial, the parties vigorously disputed the extent of the NFLPA's involvement in the pursuit of Peterson's grievance against Tampa Bay. Peterson claimed that he called his agent, Richard Mangiarelli, as soon as he was told that he had been released. Mangiarelli testified that he called the NFLPA's main office the following day to seek assistance in enforcing the injury protection clause of Peterson's contract against Tampa Bay. Mangiarelli claimed that he spoke with Harold Kennedy, a recent law school graduate who was then serving as an assistant both to the NFLPA's executive director, Edward Garvey, and to the union's staff counsel, Richard Berthelsen. Mangiarelli said that Kennedy represented to him that he was a

practicing attorney, when, in fact, he was not. Mangiarelli testified that he informed Kennedy of the injury protection clause in Peterson's contract and that Kennedy then dictated to him an injury grievance letter with instructions to send the letter to the ballclub. Peterson signed the injury grievance letter on August 5, 1977, within two weeks of the date that he was notified of his release.

Mangiarelli further testified that once the union assured him that it would handle Peterson's grievance, in mid-August, 1977, he put Peterson in direct contact with Kennedy. Peterson claimed that he remained in frequent contact with both Kennedy and Berthelsen throughout the remainder of 1977 in order to monitor the progress of his grievance. He mentioned specifically that, in early September, he spoke with Kennedy about the injury protection clause and that Kennedy assured him that the union had access to his contract. Peterson testified that he continually relied on the assurances of the two union representatives that they were handling his grievance for him.

The testimony of the union's witnesses differed sharply from that presented by Peterson and Mangiarelli. Kennedy declared that he could not recall ever speaking with either Mangiarelli or Peterson and that he had no recollection of working on Peterson's grievance. Berthelsen testified that he first became aware of Peterson's grievance in late January or early February of 1978. Berthelsen claimed that it was not until mid-February, 1978 that the union was sent copies of Peterson's contract and that he was made aware of the injury protection clause contained therein. Berthelsen explained that after examining the contracts he determined that Peterson should have filed a non-injury grievance and that, on February 17, 1978, he attempted to "rechannel" Peterson's original injury grievance into a non-injury claim. Berthelsen's efforts were undertaken well beyond the 60-day period in which Peterson could have timely filed a non-injury grievance.

The rechanneled non-injury grievance was heard by Arbitrator James Scearce on

June 16, 1978. After a hearing in which the merits of Peterson's claim under the injury protection clause were fully argued, Arbitrator Scearce dismissed the grievance as untimely filed. He ruled that Berthelsen's efforts in February, 1978 to rechannel Peterson's claim as a non-injury grievance were undertaken more than 60 days after the dispute arose and that the grievance was therefore time-barred. Arbitrator Scearce did not address the merits of Peterson's claim that, because his release was attributable to the knee injury suffered in the 1976 season, the club remained obligated, under the "injury protection" clause, to honor his 1977 and 1978 contracts. Peterson has not challenged the propriety of Arbitrator Scearce's ruling.[1]

Peterson complained to Berthelsen that the NFLPA was at fault for the dismissal of the non-injury grievance. The NFLPA then advised Peterson that it planned to reactivate the original injury grievance. The injury grievance was subsequently heard by Arbitrator Marlin M. Volz. The issue considered by Arbitrator Volz was whether Peterson was entitled to his salary under the 1977 contract pursuant to the club's obligation to continue paying his salary if he was injured in the performance of services under *that* contract. Arbitrator Volz ruled against Peterson, finding that Peterson failed to establish that he was physically unable to play professional football at the time that the contract was terminated because of an injury incurred under *that* contract. The arbitrator apparently based his decision primarily on the fact that Peterson did not incur an injury during the term of the 1977 contract.[2] He also determined, however, that Peterson was not physically unable to play football at the time he was released by Tampa Bay. The latter finding would, in itself, have justified the denial of Peterson's claim.[3]

### C. Proceedings in the District Court

Dissatisfied with the union's representation, Peterson filed the instant action in district court in November, 1980. The complaint was not served on any of the defendants, however, during the period that the union continued to pursue Peterson's injury grievance before Arbitrator Volz. Shortly after the injury grievance was dismissed, Peterson filed an amended complaint which was ultimately served on the defendants in early February, 1982.

---

1. The arbitrator found that because Peterson prefaced the grievance letter with a statement that it was being filed in accordance with Article IX of the collective bargaining agreement (governing injury grievances), the claim could not be construed as a non-injury grievance filed pursuant to Article VII of that agreement. However, the letter fully communicated the nature and the substance of Peterson's claim to Tampa Bay. On this basis alone, we seriously question the arbitrator's ruling that Peterson's grievance was time-barred. Moreover, the arbitrator failed to consider the fact the NFL and the Players Association had regularly failed to follow some of the strict time limits for handling grievances set forth in the collective bargaining agreement and that there was no equitable reason to hold Peterson to them in this case (Decision of Arbitrator Volz, November 13, 1981, referred to *infra* pp. 1249–50). In short, there appears to be little rational basis for the arbitrator's ruling. However, because Peterson has not questioned the arbitrator's ruling, either before the district court or before us, we do not determine its validity.

2. The parties apparently believed that an injury incurred in a prior year is beyond the proper scope of an injury grievance proceeding. We are not at all sure they were correct. It is possible that the question whether Peterson was released due to an injury incurred in the performance of services under the *1976* contract could properly have been considered in the injury grievance proceeding before Arbitrator Volz. There are legitimate arguments for construing Article IX as applicable to grievances involving injuries of the type suffered by Peterson even when they do not qualify as "injury grievances" under a narrow and literal construction of the words of that Article. However, that issue also has not been preserved by Peterson, at least not for purposes of this litigation.

3. As in the case of the standard injury clause, under the special "injury protection" clause of the 1977 contract Peterson would have had to establish that he was physically unable to play football at the time of his release. Accordingly, had Arbitrator Scearce reached the merits, he would have been required to determine the identical question that was determined adversely to Peterson by Arbitrator Volz.

The amended complaint alleged that the NFLPA had breached its duty of fair representation by erroneously advising Peterson to file an injury grievance and by failing to rectify its error while there was still time to do so. It also alleged that the union did not conduct an adequate investigation prior to rendering its advice. The complaint included a professional malpractice claim against the union attorneys, Berthelsen and Kennedy, for the same misconduct which formed the basis of Peterson's breach of duty claim against the union.

The district court entered summary judgment in favor of Kennedy, finding that he lacked sufficient contacts with the State of California to enable the court to exercise personal jurisdiction over him. After a three and one-half day jury trial, the district court issued a directed verdict in favor of Berthelsen, ruling that the legal malpractice claim against him was "subsumed" in and precluded by Peterson's breach of duty claim against the union. The jury returned a verdict against the NFLPA for the full amount sought by Peterson, finding that the union had breached its duty of fair representation in handling his grievance. The trial judge, however, granted the union's motion for a judgment notwithstanding the verdict (JNOV). On appeal, Peterson challenges each of the trial court's rulings.

## II. THE TIMELINESS OF PETERSON'S COMPLAINT

■ As a threshold matter, we reject the union's claim that Peterson's complaint was untimely filed. The Supreme Court has held that the National Labor Relations Act's (NLRA) six-month statute of limitations for the filing of unfair labor practice claims is applicable to suits against a union for breach of the duty of fair representation. *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 169,

103 S.Ct. 2281, 2293, 76 L.Ed.2d 476 (1983). Prior to *DelCostello*, federal courts applied the relevant state statute of limitations to breach of duty suits against labor unions. *See, e.g., Price v. Southern Pacific Transportation Co.*, 586 F.2d 750, 752 (9th Cir. 1978).

■ Until quite recently, we had repeatedly refused to give *DelCostello* retroactive effect. *See, e.g., Rodriquez v. Union Carbide Corp.*, 735 F.2d 365, 365–66 (9th Cir.1984); *Barina v. Gulf Trading & Transportation Co.*, 726 F.2d 560, 564 (9th Cir.1984). However, we have now made it clear that *DelCostello* is to be given retroactive application when doing so serves to lengthen rather than shorten the limitations period that would otherwise be applicable under state law. *See Aragon v. Federated Department Stores, Inc.*, 750 F.2d 1447, 1451 (9th Cir.1985); *Glover v. United Grocers, Inc.*, 746 F.2d 1380, 1382 (9th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985).

The parties disagree as to the date on which Peterson's cause of action arose. The union maintains that the cause of action accrued either in February, 1978, when Peterson first became aware of the union's alleged error, or in November, 1978, when Arbitrator Scearce dismissed the non-injury grievance as untimely. Peterson contends that the cause of action did not arise until November 13, 1981, the date that his injury grievance was ultimately dismissed by Arbitrator Volz.

■ We need not determine the exact date that Peterson's cause of action accrued because we conclude that the complaint was timely filed whether the cause of action arose as early as 1978 or as late as 1981. If, as the union contends, Peterson's claim accrued in 1978, the timeliness of the complaint would be assessed under California's three-year statute of limitations,[4] and would be timely commenced re-

---

**4.** The complaint was filed in the Southern District of California. We have long recognized that "the forum court utilizes its own state's statute of limitations." *Forsyth v. Cessna Aircraft Co.*, 520 F.2d 608, 613 (9th Cir.1975); *see*

*also Restatement, 2d, Conflict of Laws § 142.* California applies its own limitations law to actions brought by its citizens, with an exception not applicable here, rather than that of the state in which the cause of action arose. *See*

# 1252

gardless of which accrual date suggested by the union is applicable.[5] If, as Peterson argues, the cause of action did not accrue until November, 1981, his complaint would be timely under the NLRA's six-month statute of limitations.[6]

## III. THE DISTRICT COURT'S RULINGS

### A. *The JNOV in Favor of the Union*

■ The district court granted the union's motion for a judgment notwithstanding the verdict (JNOV) on two independent grounds: (1) the evidence demonstrated that the union's conduct amounted to no more than negligence, and negligent conduct on the part of a union is legally insufficient to sustain a claim for breach of the duty of fair representation; and (2) assuming that the union breached its duty, Peterson was not damaged thereby because he would not have prevailed on the non-injury grievance even if it had been timely filed.[7] We need only consider the first ground.

■ We review the propriety of a JNOV under the same standard that is applied by the district court. *See, e.g., Garter-Bare Co. v. Munsingwear, Inc.,* 723 F.2d 707, 709 (9th Cir.), *cert. denied,* — U.S. ——, 105 S.Ct. 381, 83 L.Ed.2d 316 (1984). A JNOV is proper when the evidence permits only one reasonable conclusion as to the verdict. *Id.* We view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Id.* A JNOV is improper if reasonable minds could differ over the verdict. *See, e.g., Yeamen v. United States,* 584 F.2d 322, 326 (9th Cir.1978).

Peterson's breach of duty claim is based principally on allegations that the union, through its representatives, erroneously advised him to file an injury grievance and that the union failed to rectify its error while there still was time to do so. We assume *arguendo* that the advice was in fact erroneous, although it is not entirely clear that such was the case. *See supra* note 2. Viewed in the light most favorable to Peterson, the evidence presented at trial established, *inter alia,* that: Kennedy, after being informed that Peterson's 1977 contract contained an "injury protection" clause, advised Peterson's agent to file an injury grievance against Tampa Bay; based on Kennedy's advice, Peterson designated his claim as an injury grievance; the union failed to recognize its error within the 60 day period in which a non-injury grievance could have timely been filed; union representatives assured Peterson on many occasions during this 60 day period that the union was handling his grievance for him; as a result of the union's assurances, Peterson failed to file a non-injury grievance within the 60 day period.

■ The district court concluded that the evidence presented was legally insufficient to sustain the jury's verdict that the

Cal.Civ.Proc.Code § 361; *see also Hall v. Copco,* 224 F.2d 884, 885 (9th Cir.1955); *Western Coal & Mining Co. v. Jones,* 27 Cal.2d 819, 828, 167 P.2d 719 (1946). Our decisions applied California's three-year statute of limitations for actions "upon a liability created by statute," Cal.Civ. Proc.Code § 338(1), to breach of duty claims that accrued prior to 1981. *See, e.g., Aragon,* 750 F.2d at 1451; *Price,* 586 F.2d at 753. Accordingly, the shorter six-month *DelCostello* rule would not be applied retroactively.

5. Under California law, a cause of action is "commenced" when the complaint is filed. *See* Cal.Civ.Proc.Code § 350.

6. As explained in *Aragon,* we had applied California's 100-day statute of limitations for actions to vacate arbitration awards, Cal.Civ.Proc. Code § 1288, to all breach of duty claims that accrued after August, 1981 and before June,

1983. *Aragon,* 750 F.2d at 1451–52; *see also Singer v. Flying Tiger Line, Inc.,* 652 F.2d 1349, 1353 (9th Cir.1981). Because the NLRA's six-month limitations period exceeds that which otherwise would have been applied under state law, the federal limitations statute governs. *Aragon,* 750 F.2d at 1451.

7. The district court did not explain the basis for the second ground of its decision. The union's primary argument is that Peterson failed to obtain a disability certification from the club physician and that such a certification constituted a condition precedent to any recovery on his part. The union does not contend that Arbitrator Volz' finding that Peterson was not physically unable to play football should be given binding effect for purposes of the present litigation.

union breached its duty of fair representation. We agree. After reviewing all of the evidence in the light most favorable to Peterson, we conclude that the union did not breach its duty of fair representation; the record is devoid of evidence that the union acted in an arbitrary, discriminatory, or bad faith manner.

The duty of fair representation is a judicially established rule imposed on labor organizations because of their status as the exclusive bargaining representative for all of the employees in a given bargaining unit. The Supreme Court recently explained the basis and scope of the duty:

The duty of fair representation exists because it is the policy of the National Labor Relations Act to allow a single labor organization to represent collectively the interests of all employees within a unit, thereby depriving individuals in the unit of the ability to bargain individually or to select a minority union as their representative. In such a system, if individual employees are not to be deprived of all effective means of protecting their own interests, it must be the duty of the representative organization to "serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct."

*DelCostello*, 462 U.S. at 164 n. 14, 103 S.Ct. at 2290 n. 14 (quoting *Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 910, 17 L.Ed.2d 842 (1967)).

A union breaches its duty of fair representation only when its conduct toward a member of the collective bargaining unit is "arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. at 190, 87 S.Ct. at 916. The duty is designed to ensure that unions represent fairly the interests of all of their members without exercising hostility or bad faith toward any. It stands "as a bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law." *Id.* at 182, 87 S.Ct. at 912.

The Supreme Court has long recognized that unions must retain wide discretion to act in what they perceive to be their members' best interests. *See, e.g., Ford Motor Co. v. Huffman*, 345 U.S. 330, 337–38, 73 S.Ct. 681, 685–86, 97 L.Ed. 1048 (1953). To that end, we have "stressed the importance of preserving union discretion by narrowly construing the unfair representation doctrine." *Johnson v. United States Postal Service*, 756 F.2d 1461, 1465 (9th Cir.1985, *as amended* May 3, 1985) (citation omitted). We have emphasized that, because a union balances many collective and individual interests in deciding whether and to what extent it will pursue a particular grievance, courts should "accord substantial deference" to a union's decisions regarding such matters. *Id.* at 1466.

A union's representation of its members "need not be error free." *Castelli v. Douglas Aircraft Co.*, 752 F.2d 1480, 1482 (9th Cir.1985). We have concluded repeatedly that mere negligent conduct on the part of a union does not constitute a breach of the union's duty of fair representation. *See, e.g., id; Clayton v. Republic Airlines, Inc.*, 716 F.2d 729, 732 (9th Cir. 1983); *Singer v. Flying Tiger Line, Inc.*, 652 F.2d 1349, 1354 (9th Cir.1981); *Stephens v. Postmaster General*, 623 F.2d 594, 596 (9th Cir.1980).

Peterson recognizes and does not challenge the established principle that a union's negligence cannot give rise to a suit for breach of the duty of fair representation. Furthermore, he does not contend that the NFLPA or any of its representatives acted toward him or his grievance in a discriminatory or bad faith manner. Rather, Peterson claims that the union breached its duty to represent him fairly because its mishandling of his grievance was so egregious as to constitute "arbitrary" conduct.

Whether in a particular case a union's conduct is "negligent", and therefore non-actionable, or so egregious as to be "arbitrary", and hence sufficient to give rise to a breach of duty claim, is a question that is not always easily answered. A un-

ion acts "arbitrarily" when it simply ignores a meritorious grievance or handles it in a perfunctory manner, *see Vaca v. Sipes*, 386 U.S. at 191, 87 S.Ct. at 917, for example, by failing to conduct a "minimal investigation" of a grievance that is brought to its attention. *See Tenorio v. National Labor Relations Board*, 680 F.2d 598, 601 (9th Cir.1982). We have said that a union's conduct is "arbitrary" if it is "without rational basis," *see Gregg v. Chauffeurs, Teamsters and Helpers Union Local 150*, 699 F.2d 1015, 1016 (9th Cir.1983), or is "egregious, unfair and unrelated to legitimate union interests." *See Johnson v. United States Postal Service*, 756 F.2d 1461, 1465 (9th Cir.1985). In *Robesky v. Qantas Empire Airways Ltd.*, 573 F.2d 1082, 1089–90 (9th Cir.1978), we held that a union's unintentional mistake is "arbitrary" if it reflects a "reckless disregard" for the rights of the individual employee, but not if it represents only "simple negligence violating the tort standard of due care." In *Dutrisac v. Caterpillar Tractor Co.*, 749 F.2d 1270, 1274 (9th Cir.1983), we concluded that unintentional union conduct may constitute a breach of the duty of fair representation in situations where "the individual interest at stake is strong and the union's failure to perform a ministerial act completely extinguishes the employee's right to pursue his claim." [8]

There are some significant general principles that emerge from our previous decisions. In all cases in which we found a breach of the duty of fair representation based on a union's arbitrary conduct, it is clear that the union failed to perform a procedural or ministerial act, that the act in question did not require the exercise of judgment and that there was no rational and proper basis for the union's conduct. For example, we found a union acted arbitrarily where it failed to: (1) disclose to an employee its decision not to submit her grievance to arbitration when the employee was attempting to determine whether to accept or reject a settlement offer from her employer, *see Robesky*, 573 F.2d at 1091; (2) file a timely grievance *after* it had decided that the grievance was meritorious and should be filed, *see Dutrisac*, 749 F.2d at 1274; (3) consider individually the grievances of particular employees where the factual and legal differences among them were significant, *see Gregg*, 699 F.2d at 1016; or (4) permit employees to explain the events which led to their discharge before deciding not to submit their grievances to arbitration. *See Tenorio*, 680 F.2d at 601.

We have never held that a union has acted in an arbitrary manner where the challenged conduct involved the union's judgment as to how best to handle a grievance. To the contrary, we have held consistently that unions are not liable for good faith, non-discriminatory errors of judgment made in the processing of grievances. *See, e.g., Castelli*, 752 F.2d at 1482; *Dutrisac*, 749 F.2d at 1273; *Singer v. Flying Tiger Line, Inc.*, 652 F.2d at 1355; *Ness v. Safeway Stores, Inc.*, 598 F.2d 558, 560 (9th Cir.1979); *see also Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 571, 96 S.Ct. 1048, 1059, 47 L.Ed.2d 231 (1976). We have said that a union's conduct may not be deemed arbitrary simply because of an error in evaluating the merits of a grievance, in interpreting particular provisions of a collective bargaining agreement, or in presenting the grievance at an arbitration hearing. *See Dutrisac*, 749 F.2d at 1273. In short, we do not attempt to second-guess a union's judgment when a good faith, non-discriminatory judgment has in fact been made. It is for the union, not the courts, to decide whether and in what manner a particular grievance should be pursued. We reaffirm that principle here.

Sound policy reasons militate against imposing liability on unions for errors of judgment made while representing their members in the collective bargaining process. In *Dutrisac*, we recognized that

---

**8.** In such an instance, the union must also have been "the solitary and indivisible cause of the complete extinguishment of [the] employee's grievance rights" before liability will be imposed. *See Eichelberger v. NLRB*, 765 F.2d 851, 855 (9th Cir.1985).

holding unions liable for such errors would serve ultimately to "defeat the employees' collective bargaining interest in having a strong and effective union." 749 F.2d at 1273. If unions were subject to liability for "judgment calls", it would necessarily undermine their discretion to act on behalf of their members and ultimately weaken their effectiveness. In the long run, the cost of recognizing such liability would be borne not by the unions but by their memberships. Not only would the direct costs of adverse judgments be passed on to the members in the form of increased dues, but, more importantly, unions would become increasingly reluctant to provide guidance to their members in collective bargaining disputes. Such a result would be inconsistent with our oft-repeated commitment to construe narrowly the scope of the duty of fair representation in order to preserve the unions' discretion to decide how best to balance the collective and individual interests that they represent.

Freeing a union from liability for ordinary acts of negligence in the performance of its representational responsibilities requiring judgment on its part, reflects a balance of the union's organizational interest against the individual interests of its members. Our cases, and those of the Supreme Court, tip the balance in favor of the union, and accept the consequence of uncompensated loss sustained by an individual union member. Whether liability for a loss occasioned by ordinary negligence of the union might be spread more equitably among the membership as a whole, rather than be borne by the individual member who is harmed, is no longer an open question.

In applying the foregoing principles to the case at hand, we conclude, as a matter of law, that Peterson failed to establish that the NFLPA breached its duty of fair representation. As mentioned, Peterson does not contend that the union acted in a discriminatory or bad faith manner toward either him or his grievance. He relies exclusively on his claim that the union's error was so egregious as to be "arbitrary." We disagree. The alleged error was one of

judgment. Viewing the evidence in the light most favorable to Peterson, the most that can be said is that the union provided him with incorrect advice and did not alter its judgment until it was too late to rectify the error. In this case, deciding whether to file an injury or a non-injury grievance was not a purely mechanical function; the union attorneys were required to construe the scope and meaning of the injury and non-injury grievance provisions of the collective bargaining agreement and to determine which of the two grievance procedures was more appropriate. As we have indicated earlier, the answer was not as simple as a literal reading of the two contract sections might indicate. *See supra* note 2.

■ Peterson also contends that the union failed adequately to investigate the facts and circumstances of his claim before advising him to file an injury grievance. Peterson does not specify exactly what the union neglected to do; however, his only possible claim appears to be that the union failed to examine copies of his contracts with Tampa Bay before rendering its advice. We find this contention insufficient as a matter of law. Both Peterson and his agent testified that they informed Kennedy of the inclusion of the "injury protection" clause in Peterson's 1977 contract and described its substance to him. We do not believe that a further examination of that provision, or of any other provision in Peterson's contracts, would have better enabled Kennedy to advise Peterson as to which form of grievance to file. It was the grievance and arbitration provisions of the standard collective bargaining agreement, rather than the "injury protection" clause of Peterson's contract, that the union was required to construe in order to determine which grievance procedure was applicable to Peterson's claim. Examining the text of the injury protection clause would not have materially influenced the union's judgment in that regard.

Although the union's representatives may have erred in initially advising Peterson to file an injury grievance and in fail-

ing to recognize its mistake in time to file a non-injury grievance in its stead, we are unwilling to subject unions to liability for such errors in judgment. Accordingly, we affirm the district court's conclusion that the evidence presented was insufficient, as a matter of law, to support the jury's verdict against the union.

### B. *The Directed Verdict in Favor of Berthelsen*

The district court issued a directed verdict in favor of Berthelsen, concluding that Peterson's malpractice claim against the union attorney was "subsumed" in and precluded by the breach of duty claim asserted against the union. We review a directed verdict under the same standard as that which we apply when reviewing a JNOV. A directed verdict is proper when the evidence permits only one reasonable conclusion as to the verdict. *See, e.g., Shakey's Inc. v. Covalt,* 704 F.2d 426, 430 (9th Cir.1983). It is inappropriate if there is substantial evidence to support a verdict for the non-moving party. *See, e.g., Id.; Fabrica Inc. v. El Dorado Corp.,* 697 F.2d 890, 892 (9th Cir.1983). We consider all of the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Id.*

The material facts are uncontested. As it customarily did for its members, the NFLPA undertook Peterson's grievance free of charge to him. Berthelsen, as chief staff counsel for the NFLPA, was the union official ultimately responsible for the handling of Peterson's grievance. Dating back to 1972, Berthelsen had been employed as a full-time salaried member of the union's staff. The evidence is undisputed that Berthelsen's sole involvement with Peterson's grievance was in the capacity of staff counsel for the NFLPA; he was not privately retained by Peterson to pursue the grievance.

The district court dismissed the damage claim against Berthelsen, concluding that Peterson could not proceed against him for alleged misconduct that occurred during the course of Berthelsen's employment as the union's staff attorney. Peterson contends that, as an attorney, Berthelsen remains subject to liability for professional malpractice independent of the union's potential liability for breach of its duty of fair representation. He claims that the district court erred in concluding that his malpractice claim against Berthelsen was "subsumed" in his claim against the union. We reject Peterson's contention. We believe that sound policy reasons as well as established precedent compel the conclusion that attorneys who perform services for and on behalf of a union may not be held liable in malpractice to individual grievants where the services the attorneys perform constitute a part of the collective bargaining process.

### 1. *The Atkinson Rule: Union Officers and Employees Are Immune From Personal Liability For Acts Undertaken As Union Representatives*

It has long been recognized that union officers and employees are not individually liable to third parties for acts performed as representatives of the union in the collective bargaining process. In *Atkinson v. Sinclair Refining Co.,* 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962), the Supreme Court held that individual damage claims may not be maintained against union officials for acts that are undertaken on behalf of the union. In *Atkinson,* the employer brought an action against the union and against certain designated union officers for the defendants' alleged breach of a no-strike agreement. The Court concluded that "the union as an entity ... should in the absence of agreement be the sole source of recovery for injury inflicted by it ...," and emphasized specifically that "[t]his policy cannot be evaded or truncated by the simple device of suing union agents or members, whether in contract or in tort, or both, in a separate count or in a separate action for damages...." *Id.* at 249, 82 S.Ct. at 1325. The *Atkinson* Court explained the historical basis for its refusal to permit third party damage claims to be

asserted against a union's officers or employees:

> When Congress passed § 301, it declared its view that only the union was to be made to respond for union wrongs, and that the union members were not to be subject to levy. Section 301(b) has three clauses. One makes unions suable in the courts of the United States. Another makes unions bound by the acts of their agents according to conventional principles of agency law (cf. § 301(e)). At the same time, however, the remaining clause exempts agents and members from personal liability for judgments against the union (apparently even when the union is without assets to pay the judgment). The legislative history of § 301(b) makes it clear that this third clause was a deeply felt congressional reaction against the *Danbury Hatters* case (*Loewe v. Lawlor,* 208 U.S. 274 [28 S.Ct. 301, 52 L.Ed. 488 (1908)]; *Lawlor v. Loewe,* 235 U.S. 522 [35 S.Ct. 170, 59 L.Ed. 341 (1915)]), and an expression of legislative determination that the aftermath (*Loewe v. Savings Bank of Danbury,* 236 F. 444 (C.A.2d Cir. [1916])) of that decision was not to be permitted to recur.

*Id.* at 247–48, 82 S.Ct. at 1324–25.

In *Complete Auto Transit, Inc. v. Reis,* 451 U.S. 401, 101 S.Ct. 1836, 68 L.Ed.2d 248 (1981), the Supreme Court reaffirmed and extended the holding of *Atkinson.* The Court ruled that a damage claim may not be brought against individual union officers or members even if the individual's conduct was unauthorized by the union and was in violation of an existing collective bargaining agreement. *Id.* at 402, 101 S.Ct. at 1838. The Court reiterated that "the legislative history of § 301 clearly reveals Congress' intent to shield individual employees from liability for damages arising from their breach of … a collective bargaining agreement." *Id.* at 407, 101 S.Ct. at 1840; *accord Hardline Electric, Inc. v. International Brotherhood of Electrical Workers, Local 1547,* 680 F.2d 622, 624 n. 1 (9th Cir.1982), *cert. denied,* 459 U.S. 1170, 103 S.Ct. 814, 74 L.Ed.2d 1013 (1983).

We have read *Atkinson* to preclude employees from maintaining a state tort claim against union officials in conjunction with a section 301 breach of duty claim against a union. In *Williams v. Pacific Maritime Association,* 421 F.2d 1287 (9th Cir.1970), the petitioners brought a state tort claim against union officials, alleging that the officials conspired to bring about their wrongful deregistration and discharge, in addition to a federal claim against the union, alleging that the officials' conduct amounted to a breach of the union's duty of fair representation. We ruled that, in light of *Atkinson,* the state tort claim could not be maintained against the individual union officials. *Id.* at 1289.

Other courts similarly have read *Atkinson* to prohibit claims, both state and federal, tort and otherwise, against individuals who are employees of or acting as agents or representatives of their unions. *See, e.g., United Steelworkers of America v. Lorain,* 616 F.2d 919, 924 (6th Cir.1980) (union officers not individually liable for damages resulting from alleged breach of collective bargaining agreement), *cert. denied,* 451 U.S. 983, 101 S.Ct. 2313, 68 L.Ed.2d 839 (1981); *Universal Communications Corp. v. Burns,* 449 F.2d 691, 693–94 (5th Cir.1971) (per curiam) (section 301 forbids recovery of damages from individual union members "*even if the claim purports to be based exclusively on state law.*" (emphasis in original)); *Balestreri v. Western Carloading,* 530 F.Supp. 825, 830 (N.D.Cal.1980); *Suwanchai v. International Brotherhood of Electrical Workers,* 528 F.Supp. 851, 862 (D.N.H.1981); *Henry v. Radio Station KSAN,* 374 F.Supp. 260, 267 (N.D.Cal.1974).

> 2. *The Atkinson Rule Applies To and Bars Malpractice Claims Against Attorneys Representing the Union*

■ We do not agree with Peterson's contention that an exception to the *Atkinson* rule should be fashioned for union employees who happen to be attorneys.

Where, as here, the attorney performs a function in the collective bargaining process that would otherwise be assumed by the union's business agents or representatives, the rationale behind the *Atkinson* rule is squarely applicable.

In handling Peterson's labor grievance, Berthelsen assumed a function that often is performed by a union's business agents or representatives. Labor grievances and arbitrations frequently are handled by union employees or representatives who have not received any professional legal training at all. A union may, on the other hand, choose to have its interests in any part of the collective bargaining process represented by a professionally trained attorney. If so, the union will either utilize the services of its in-house staff of attorneys, if it has one, or the services of its regularly retained outside law firm, or may even on occasion employ special outside counsel. When the union uses its regular outside counsel, the services are sometimes covered under an overall retainer agreement, and there is no additional fee or charge to the union for the law firm's handling of the matter. In any event, whether it be house counsel or outside union counsel, where the union is providing the services, the attorney is hired and paid by the union to act for it in the collective bargaining process.[9]

■ We recognize that there are cases in which an attorney represents the union in an arbitration proceeding, but the underlying grievance belongs to a particular union member who has a very real interest in the manner in which the grievance is pro-

cessed. That union member surely is justified in expecting the attorney to perform in a competent and professional manner; a portion of his dues is paid to enable the union to represent his interests vis-a-vis his employer effectively in all stages of the collective bargaining process. Nevertheless, when the union is providing the services, it is the union, rather than the individual business agent or attorney, that represents and is ultimately responsible to the member.

■ We do not believe that an attorney who is handling a labor grievance on behalf of a union as part of the collective bargaining process has entered into an "attorney-client" relationship in the ordinary sense with the particular union member who is asserting the underlying grievance. Although the attorney may well have certain ethical obligations to the grievant, his principal client is the union; it is the union that has retained him, is paying for his services, and is frequently the party to the arbitration proceedings.

The legal theory we describe tracks the practical realities of labor-management relations in the United States today. The union member looks to his union to save his job, gives it credit when a dispute is resolved in his favor, and holds it responsible when his discharge is upheld or he loses other important rights. He views the union attorney as an arm of his union rather than as an individual he has chosen as his lawyer. In fact, it is not uncommon for the union member to be completely unaware,

---

**9.** Our concurring colleague suggests that *Atkinson* mandates that retained outside counsel not be insulated from liability under § 301(b). The relevant language in *Atkinson* is the following:

> Another [clause of § 301(b)] makes unions bound by agents according to conventional principles of agency law (cf. § 301(e)). At the same time, however, the remaining clause exempts agents and members from personal liability ...

370 U.S. at 248, 82 S.Ct. at 1324 (quoted *supra* at 1257). The concurrence appears to suggest that while the Supreme Court used the word "agents" in the first quoted sentence in its traditional common law sense, it meant something quite different when it used the same word

"agents" in the immediately following sentence. Although there is no question that when the Court used "agents" the first time it was referring to all agents, including attorneys and others, regardless of their employment or membership status, according to the concurrence when the Court used "agents" the second time it meant only those agents who also happen to be union members or officials. We cannot believe that the Court would have given the word "agents" such radically different meanings in consecutive sentences without some indication of its intent to do so. For this reason, as well as for the other reasons set forth in this part of our opinion, we reject the approach of our concurring colleague.

at least prior to the arbitration hearing, of who on the union's staff is actually handling his grievance.

Although all of the considerations we have mentioned are important, the rule we adopt is based primarily on a functional assessment of the attorney's role as a union representative within the collective bargaining process. Union officers, employees and agents are not subject to individual liability for acts performed on behalf of the union in the collective bargaining process. *See* text *supra* pp. 1256–57. A different result is not warranted or permissible merely because a union chooses to employ an attorney rather than a business agent to perform collective bargaining functions.

■ Our decision does not mean that union members are necessarily without a remedy when attorneys employed by the union fail to process grievances adequately. If an attorney's conduct falls within the "arbitrary, discriminatory or bad faith" test we have described in section III.A., *supra*, the union member may sue the union for breach of the duty of fair representation. We also note that nothing we have said limits a union's right to sue its attorney for malpractice or for breach of contract, and to compensate a union member out of the recovery for any damages he may have suffered.

■ There are other instances in which union members whose grievances are improperly handled may recover damages from an attorney. Our decision does not preclude malpractice suits by union members who have themselves retained counsel to process grievances on their behalf, even though the individual or firm also serves as the union's regular outside counsel and is employed at the union's suggestion, *see* text *infra* pp. 1259–60. Union members may also sue attorneys whether or not the attorneys are employed by the union where the legal services provided are wholly un-

related to the collective bargaining process; *e.g.*, drafting a will, handling a divorce or litigating a personal injury suit. In such cases the *Atkinson* rule is inapplicable.

3. *Other Policy Reasons Why Attorneys Representing the Union Should Not Be Subject To Malpractice Liability For Collective Bargaining Activity*

■ Our reluctance to impose malpractice liability on union attorneys for conduct undertaken as the union's collective bargaining agents stems in part from policy considerations independent of the *Atkinson* rule. Negligence is the essence of a malpractice action. *See, e.g., Raddatz v. United States*, 750 F.2d 791, 795 (9th Cir. 1984) (medical malpractice). However, negligence is insufficient to support a breach of the duty of fair representation suit against a union; a union's conduct must be arbitrary, discriminatory, or in bad faith. *See supra* section III.A. Holding that union attorneys are subject to malpractice suits by individual grievants for actions undertaken as the union's representative would give rise to an anomalous result: certain agents or employees of the union would be held to a far higher standard of care than the union itself.

Equally important, permitting recovery against union counsel would destroy the rationality and symmetry the Supreme Court has finally brought to the law with respect to the time for the filing of suits in cases involving claims by union members that their grievances were mishandled. If union attorneys were subject to malpractice liability in such cases, litigants would be able to proceed against the attorney long after the expiration of the statutory period for suits against both the union and the employer.[10] Thus, the union attorney would often be the only defendant against whom a disappointed grievant could proceed. He would become the natural, and

---

10. In *DelCostello*, the Supreme Court ruled that "hybrid" suits against labor unions and employers must be commenced within six months of the date that the cause of action accrues. 462 U.S. at 172, 103 S.Ct. at 2294. The statutory

period for malpractice suits, on the other hand, is considerably longer. *See, e.g.,* Cal.Civ.Proc. Code § 340.6 (West 1982) (limitations period for malpractice claims may be as long as four years from date of alleged wrongful act).

only, target in large numbers of what would normally be breach of the duty of fair representation suits.

We find such a prospect not only unsettling but also inconsistent with the considerations that prompted the Supreme Court to apply the NLRA's six-month time limit to "hybrid" suits against labor unions and employers. Instead of bringing labor-management quarrels to a quick termination so that peace and harmony may be restored and all parties may know the meaning of the particular contractual provision at issue, allowing malpractice suits to be brought against a union attorney for two, three, or even four years beyond the time for filing suit against the union or the employer would serve to shift the forum for the dispute and create a new target defendant. In the long run, the cost of legal services to unions would rise, and the ultimate financial burden resulting from such suits would fall on them.

### 4. *Our Past Precedents*

Peterson contends that two of our prior decisions stand for the proposition that a union member may bring a state malpractice claim against the union's attorney in addition to a federal breach of duty claim against the union. We read those decisions differently.

In *Weitzel v. Oil Chemical & Atomic Workers*, 667 F.2d 785 (9th Cir.1982), we ruled that the district court erred in concluding that, as a matter of law, a malpractice action could not be maintained against a private law firm to which a union member had been referred by his union. In that case, the record before us contained only "fragmentary facts"; we held that they were insufficient to permit the district court to conclude, at the summary judg-

ment stage, that an attorney-client relationship had not been formed between the union member and the law firm. Of course, if such a relationship had been formed, the firm would not have been acting primarily on behalf of the union or as the union's agent in the collective bargaining process. Rather, it would have been serving as private counsel to the individual grievant. Although our opinion did not deal with the precise point, we indicated that such was our view when we explained why Weitzel might ultimately be entitled to recover. We spoke in terms of "[c]omplainants who retain private counsel ...," and added, "[h]aving bargained for private counsel's services, they are entitled to receive them." *Id.* at 787.

Nor did our recent decision in *Aragon v. Federated Department Stores, Inc.*, 750 F.2d 1447 (9th Cir.1985), hold that a law firm that is employed or retained by a labor union may be liable to an individual grievant for malpractice committed in connection with its union representation. In *Aragon*, a discharged employee brought suit against her former employer for breach of its collective bargaining agreement, against her former union for breach of its duty of fair representation, and against the union's outside law firm for professional malpractice. We construed the malpractice claim against the law firm as based on "its alleged unsatisfactory work *on her behalf.*" *Id.* at 1448 (emphasis added). The district court dismissed the malpractice claim pursuant to Fed.R.Civ.Proc. 12(b)(6) for failure to state a claim. We reversed, concluding that summary dismissal was inappropriate.[11] In remanding, we said that "[i]t is the province of the [lower] court to determine whether Aragon has alleged facts sufficient to withstand a motion to dismiss." *Id.* at 1458. Thus, *Aragon* stands

---

**11.** Much of our analysis in *Aragon* was devoted to determining whether, as a matter of law, a malpractice claim against a law firm for its mishandling of a labor grievance is preempted by federal labor law. We concluded that it is not. Clearly that result is required where the attorney is neither an employee of the union nor acting as its agent or representative. However, *Aragon* does not discuss *Atkinson* or any of

the cases prohibiting the imposition of liability on employees or agents of the union for actions taken on behalf of the union in connection with the collective bargaining process. In the absence of any such discussion, we do not believe that it was the intent of *Aragon* to modify or overrule the well established rule barring suits, including state tort actions, against individual officers or employees of unions.

for the proposition that a malpractice claim against a union's outside law firm for its work in connection with a labor grievance may not be dismissed summarily if triable questions of fact exist. Among the factual questions that must be answered where outside union counsel represents the grievant is whether counsel was retained by and was working on behalf of the union or the individual member. If the former, a malpractice suit may not be brought by the grievant; if the latter, the answer will often be to the contrary.

Neither in *Weitzel* nor in *Aragon* did we decide what facts or circumstances a union member would be required to show in order to establish the existence of a private attorney-client relationship between himself and a law firm that is retained generally to represent his union. Certainly, at the least, it would be necessary for him to prove that in his particular case the law firm was not acting pursuant to its obligation to provide representation for or on behalf of the union and that it had specifically agreed, instead, to provide direct representation to him as an individual client.

We have little difficulty in reconciling our holdings in *Weitzel* and in *Aragon* with the conclusion that we reach in this case. Unlike the earlier cases, it is clear here that the attorneys involved were acting on behalf of the union in carrying out the union's obligation to represent its members in the collective bargaining process. We thus affirm the district court's judgment that a malpractice action against Berthelsen will not lie.

## C. *The Summary Judgment in Favor of Kennedy*

■ Peterson contends that the district court improperly granted summary judgment in favor of Kennedy. The court concluded that, as a matter of law, Kennedy had insufficient contacts with the State of California to justify the exercise of personal jurisdiction over him. We review this legal conclusion *de novo*.

■ Where a defendant has "substantial" or "continuous and systematic" contacts with the forum state, there is a sufficient relationship between the defendant and the state to support "general personal jurisdiction" even if the cause of action is unrelated to the defendant's forum activities. *Data Disc, Inc. v. Systems Technology Associates, Inc.*, 557 F.2d 1280, 1287 (9th Cir.1977). Peterson does not suggest that Kennedy had such contacts with the State of California. Rather, Peterson contends that Kennedy was subject to the "limited personal jurisdiction" of the district court as a result of his purposeful contacts with California which gave rise to the instant cause of action.

■ Lacking sufficient contacts to support general jurisdiction, non-resident defendants may still be subject to limited personal jurisdiction depending on "the nature and quality of the defendant's contacts [with the forum] in relation to the cause of action." *Id.* We have established a tripartite test for determining whether due process allows for the exercise of limited personal jurisdiction in a given case:

> (1) The nonresident defendant must do some act or consummate some transaction with the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws. (2) The claim must be one which arises out of or results from the defendant's forum-related activities. (3) Exercise of jurisdiction must be reasonable.

*Id.* (citations omitted). Each of the three tests must be satisfied to permit a district court to exercise limited personal jurisdiction over a non-resident defendant.

■ Both parties agree that Kennedy's sole contacts with California consisted of a series of telephone calls that he made to Peterson from the union's Washington D.C. office and letters that he sent to a California physician regarding Peterson's injury. The parties disagree, however, as to whether such contacts are sufficient to meet the limited jurisdiction test.

Kennedy argues that the nature of his contacts with California were insufficient as a matter of law to enable the district court to exercise limited personal jurisdiction over him. We agree. Both this court and the courts of California [12] have concluded that ordinarily "use of the mails, telephone, or other international communications simply do not qualify as purposeful activity invoking the benefits and protection of the [forum] state." *Thos. P. Gonzalez Corp. v. Consejo Nacional de Produccion de Costa Rica,* 614 F.2d 1247, 1254 (9th Cir.1980); *see also Floyd J. Harkness Co. v. Amezcua,* 60 Cal.App.3d 687, 692–93, 131 Cal.Rptr. 667, 670 (1976); *Interdyne Co. v. SYS Computer Corp.,* 31 Cal.App.3d 508, 511–12, 107 Cal.Rptr. 499, 501–02 (1973). Such contacts are normally legally insufficient to satisfy the first prong of the *Data Disc* test. We see no basis for making an exception to the general rule here. We affirm the district court's ruling that it lacked personal jurisdiction over Kennedy.

## IV. CONCLUSION

The district court properly concluded that the evidence presented was legally insufficient to sustain the jury's verdict that the union breached its duty of fair representation. The union did not act in an "arbitrary, discriminatory, or bad faith" manner. Moreover, we affirm the district court's dismissal of the malpractice claim against Berthelsen. A union attorney may not be held liable in malpractice to an individual union member for acts performed as the union's agent in the collective bargaining process. Finally, the district court properly entered summary judgment in favor of Kennedy. The making of telephone calls and the sending of letters to the forum state was legally insufficient to enable the court to exercise personal jurisdiction over the non-resident defendant.

AFFIRMED.

12. The district court's determination of a party's amenability to suit is made by reference to the law of the state in which it sits. *See, e.g., Paccar International, Inc. v. Commercial Bank of Ku-*

WIGGINS, Circuit Judge, concurring:

I concur in Parts II and III A of the court's opinion, and in the affirmance of the district court's judgment. I do not agree with the vast extention of immunity from suit under section 301 of the Labor-Management Relations Act which the majority undertakes, gratuitously, in Part III B of its opinion.

The case before us involves the actions of an attorney who, as a full time employee of a union, undertook the representation of a union member with respect to a grievance with the employer. We need only decide whether the rule of *Atkinson v. Sinclair Refining Co.,* 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962), insulates the union's *in-house* counsel from a claim for damages by a union member who alleged that the attorney was guilty of ordinary negligence. There is no occasion for us to reach the more difficult question of whether *outside* counsel should be afforded the same protections.

Nevertheless, in what can only be characterized as a learned discussion of a hypothetical question, the majority undertakes to apply the rule of *Atkinson* to outside counsel. The majority's discussion is unnecessary to its opinion; more unfortunately it is also wrong. Only because the majority opinion may be misunderstood, and therefore misapplied, do I feel obliged to write separately to rebut its dicta.

The attorney, Berthelsen, was at all relevant times an employee of the union. As a union-employed attorney, he should not ordinarily be liable personally to a union member for actions relating to the union's representation responsibilities. In such a case, the reason behind the rule in *Atkinson* demands that liability be fixed on the union itself. Moreover, the union's liability for the conduct of its attorney-employee would be judged against a standard of arbitrary or discriminatory conduct or conduct

*wait, S.A.K.,* 757 F.2d 1058, 1062 n. 2 (9th Cir. 1985); *Hunt v. Erie Insurance Group,* 728 F.2d 1244, 1246 (9th Cir.1984).

amounting to bad faith and would be determined in a federal cause of action under Section 301. *See Vaca v. Sipes*, 386 U.S. 171, 187–88, 87 S.Ct. 903, 915–16, 17 L.Ed.2d 842 (1967).

I do not challenge the application of these rules to the instant case.[1] Those historical reasons that moved Congress to enact section 301(b) freeing union officials from liability for conduct undertaken on behalf of the union or any of its members in furtherance of the representational responsibilities of the union, are described in *Atkinson*, 370 U.S. at 247–249, 82 S.Ct. at 1324–1325. The present facts accord with the reason for the rule stated in *Atkinson*. Berthelsen was a full-time employee. If such an employee, simply because his normal responsibilities required that he act as an attorney for a union member, were to be exposed to the full measure of personal liability for his ordinary negligence, the history of *Danbury Hatters* would be repeated. As *Atkinson* records, it was to avoid a recurrence of the *Danbury Hatters* case that section 301(b) was enacted.

The hypothetical case about which the majority writes extensively stands in sharp contrast. The history of the *Danbury*

*Hatters* case, and the Congressional debate leading to the enactment of Section 301(b), see 93 Cong.Rec. 5014, 5041–42 (1947), simply have no application to an independent agent. To be sure, an attorney who is not a union employee but is retained by a union to represent it and its members in grievance disputes with an employer is an "agent" of the union[2] and of the union member as well, in the sense that all attorneys are agents of their clients. Such an attorney is an example, but not a typical one, of the many independent agents who provide professional services to unions.[3] The question is whether outside counsel, as an independent agent of the union and one of its members, is entitled to the protection of the Labor-Management Relations Act as a defense to an action by the union member client for damages.

The majority concludes that such an independent agent is entitled to that protection. It relies upon "sound policy reasons as well as established precedent...." *Ante*, at 1256. Believing that relevant precedent points exactly in the opposite direction, it is unnecessary for me to buttress my disagreement with the majority upon policy considerations.

---

**1.** In another case, the facts may dictate a different result. An attorney who is a full-time employee of a union may, with the consent of the union and the member, undertake to represent the member with respect to such matters as would justify concluding that the attorney was the independent counsel for the member. In such a case, analysis would proceed as if the attorney, for liability purposes, were independent of the union. Here, the facts do not justify such an analysis. It appears that representation of union members by the union attorney was a usual and customary function of the union, assigned routinely by it to in-house counsel.

**2.** References in *Atkinson* to the inability to sue union "agents" under section 301(b) should be read in context. *Atkinson* involved a suit against 24 committeemen. The employer's complaint alleged that these workers, as "agents" of the union's international, had led a strike in violation of the contract. 370 U.S. at 240, 82 S.Ct. at 1320. The Court in no way implied that all "agents" of the union, in the common law sense, were to be afforded the same protection against suit as were these committeemen, who were both union members and officers. Similarly, the reference by the Supreme Court to "conventional principles of

agency law" must also be put in its context; the reference was not part of a discussion of the third clause of section 301(b), which we must interpret, but of the second clause of that section, which is not under consideration here. 370 U.S. at 248, 82 S.Ct. at 1324. Common law agency principles have been considered relevant only as to whether the *union* may be sued for the acts of its officials with regard to wildcat strikes and other extra-contractual activity, *see, e.g. North River Energy Corp. v. United Mine Workers*, 664 F.2d 1184 (11th Cir.1981) (common law agency principles hold union liable for all acts of its officers and agents within the scope of their general authority). The portion of section 301(b) immunizing union members and officers from suits was, in fact, an abrogation of common law agency principles.

**3.** Included in this category of independent agents are insurance brokers, fund managers, economists, accountants, statisticians, consultants, and many others. What sets outside counsel apart from other independent agents is his direct role as the attorney for a particular union member.

The linchpin of the majority's case based upon precedent is *Atkinson v. Sinclair Refinning Co., supra.* That case holds that the union is the sole source of recovery for the wrongful acts of union officials and members committed in the bargaining process and causing injury to third parties. As I have noted, *Atkinson* speaks of union "agents" as being within the protection of the rule, but the Court was referring to the acts of union member/officers. Every case cited by the majority on this issue likewise involved union "officials," including business agents employed by the union,[4] or rank and file workers.[5] Independent research has uncovered no case in which the protection of *Atkinson* was extended to one who was neither a member nor an officer of the union.[6] Nevertheless, I believe that Section 301(b) is properly interpreted to insulate a union's non-member employees because Congress' intention was to avoid the debilitating effect on a union that would attend personal judgments against those who are vital to the organization's continued existence. It is the policy behind exempting members and officers that militates in favor of also immunizing the union's non-member employees.

The absence of authority for the proposition that agents who are neither members nor employees of the union are protected from suit under section 301 is not surprising. As *Atkinson* itself points out, the genesis of section 301(b) was a reaction against the *Danbury Hatters* case, in which union busting by oppressive judgments against union officers and employees was condoned. Judgments against independent third parties, such as outside counsel, because of their negligent acts which harm union members have no necessary economic impact upon the union itself. Attorneys are too plentiful and their rates too competitive to expect a judgment against a particular attorney to result in an attempt by that attorney to recapture the loss by higher rates to his union client.

A judgment against outside counsel for malpractice is not a judgment for which one of its independent clients, the union, is also liable under normal rules of tort law. There is simply no malpractice exposure to the union.[7]

Only several months ago this court decided *Aragon v. Federated Department Stores, Inc.,* 750 F.2d 1447 (9th Cir.1985). That case *reversed* a judgment dismissing a legal claim against the union's outside counsel. The claim was analyzed by the court as a pendent state claim and thus completely outside the preemptive arm of section 301(a).

Three years ago we decided *Weitzel v. Oil Chemical and Atomic Workers,* 667 F.2d 785 (9th Cir.1982). There, we also *reversed* a judgment dismissing a claim against outside counsel by a union member.

The majority distinguishes each of these cases on a theory which I believe to be novel: When a union-employed attorney undertakes to represent a union member, the union-employed attorney does not nec-

4. *United Steelworkers v. Lorain,* 616 F.2d 919, 924 (6th Cir.1980), *cert. denied,* 451 U.S. 983, 101 S.Ct. 2313, 68 L.Ed.2d 839 (1981); *Williams v. Pacific Maritime Association,* 421 F.2d 1287 (9th Cir.1970); *Balestreri v. Western Carloading,* 530 F.Supp. 825, 831 (N.D.Cal.1980); *Suwanchai v. International Broth. of Electrical Workers,* 528 F.Supp. 851, 852 (D.N.H.1981); *Henry v. Radio Station KSAN,* 374 F.Supp. 260, 267 (N.D. Cal.1974).

5. *Complete Auto Transit, Inc. v. Reis,* 451 U.S. 401, 402, 101 S.Ct. 1836, 1838, 68 L.Ed.2d 248 (1981) (involved union members; stated that "In *Atkinson* ... the Court held that § 301(a) [*sic* ] ... does not authorize a damages action against individual union *officers* and *members* when their union is liable for violating a no-strike clause in a collective bargaining agreement" (emphasis added) ); *Hardline Electric, Inc. v. International Brotherhood of Electrical Workers Local 1547,* 680 F.2d 622, 624 n. 1 (9th Cir.1982); *Universal Communications Corp. v. Burns,* 449 F.2d 691, 693–94 (5th Cir.1971) (per curiam).

6. *See, e.g., Republic Steel Corp. v. United Mine Workers of America,* 570 F.2d 467, 478 (3rd Cir.1978) (officers and members); *Sinclair Oil Corp. v. Oil, Chemical and Atomic Workers Int. Union,* 452 F.2d 49, 52 (7th Cir.1971) (members).

7. The union may be responsible under the applicable restrictive standard for referring its members to incompetent attorneys.

essarily become the member's attorney. With this premise in mind, the majority reviewed the sketchy facts in *Aragon* and *Weitzel.* It concluded that in each case the attorney was incidentally outside counsel for the union, but in the particular matter involved in those cases, the attorneys were acting as the personal attorney of the union member and not on behalf of the union. Accordingly, the protections of section 301 were not available to the attorney. Returning to the instant case, the majority concludes that the union-employed attorney, Berthelsen, was acting for the union and not personally on behalf of the union member. Thus, as agent for the union, but not the member, section 301 applies. The majority extends that peculiar notion to outside counsel.

I cannot accept the unusual role which the majority carves out for some attorneys in order to distinguish *Aragon* and *Weitzel.* All attorneys owe allegiance to their clients with respect to the subject of their representation. Attorneys representing a union may, with complete ethical propriety, undertake the simulataneous representation of a union member with respect to a grievance in which the union has no adverse interest. Such an undertaking in no way diminishes the duty which the attorney owes to each client. Each representation is distinct from the other. Each requires the same high degree of judgment, skill and discretion which society properly demands of persons occupying positions of trust and honor.

In the handling of a particular grievance, the union may refer a union member to its retained counsel. The act of referral by the union does not dilute the duty owed by the attorney to the referred client upon accepting the representation. The union may pay the fee to such an attorney. The duty of care owed by an attorney to a client does not depend upon the source of his fees. In summary, there can be no exception to the universally understood rule that when an attorney undertakes to represent a client in a particular matter, he is the attorney for and owes complete alle-

giance to that client for so long as the relationship continues.

If I correctly understand its views, the majority would recognize a hyphenated attorney: the union-attorney who may represent a union member, but not as a client. It reaches this conclusion, in my opinion, only because of a felt need to identify outside counsel closely *as the union's attorney* in order to claim the protection of *Atkinson.* As I have previously indicated, the protection of that case and section 301(b) turns upon totally different factors: union membership or employment by the union.

The majority seriously undercuts its basic premise by acknowledging that *unions* may sue their attorneys for ordinary acts of negligence. Ante, at 1259. No principled reason is apparent why public policy justifies the immunity of outside attorneys from suits by one client, the union member, but not another, the union itself.

Although I agree with the result in the instant case, from the foregoing comments it is clear that I believe the majority opinion should be read with caution.