5 F.3d 539
NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 Robert SANDERS, Plaintiff-Appellant,
v.
OGDEN ALLIED LEISURE SERVICES, INC., A Delaware Corporation;
Culinary Workers' Local Union # 226, Defendants-Appellees.
 No. 92-15618.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Aug. 11, 1993.
Decided Sept. 13, 1993.
 
 Appeal from the United States District Court for the District of Nevada, No. CV-89-00735-RDF; Philip M. Pro, District Judge, Presiding.
 D.Nev., 804 F.Supp. 86.
 AFFIRMED.
 Before: SNEED, POOLE, and TROTT, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Robert Sanders ("Sanders"), who is black, worked for Ogden Allied Leisure Services ("Ogden"), an airline catering company, as a food transport equipment handler. Ogden fired Sanders after he was involved in an accident. Sanders sued both Ogden and his union, the Culinary Union Workers Local No. 226 ("Union"), for race discrimination under Title VII and 42 U.S.C. Sec. 1981, and various other claims. The district court granted summary judgment in favor of the defendants. We affirm.
 
 I.
 FACTS AND PRIOR PROCEEDINGS
 
 3
 Sanders, a Union member, was employed as a food transport equipment handler by Ogden. A collective bargaining agreement set out termination procedures. Under the agreement, an employee must be given notice and an opportunity to correct a problem before being discharged except in certain instances such as willful misconduct. A manager testified that willful misconduct includes a situation in which a fully trained employee willfully violates safety procedures thereby damaging an aircraft. U.E.R. 22C at 54-56.
 
 
 4
 Ogden has certain safety procedures for the two person teams who load food supplies onto an airplane: After the truck is positioned under the aircraft, the two employees, a driver/operator and a loader/guide, enter the rear door of the truck bed (the one away from the airplane) and close the rear door. The driver then opens the front door (the one closest to the airplane) and raises the truck bed up to the level of the plane using a pair of "deadman" switches--ones that require the simultaneous use of two hands to operate--located at the front of the truck. By raising the truck from the front, the driver can see the aircraft and correct any misalignment. Once the truck is in place, the driver and loader move the food onto the plane.
 
 
 5
 On April 9, 1989, Sanders and a junior coworker, Mike Ward, were delivering supplies to an Air America L1011 airplane. They were in a hurry. Sanders simultaneously started to close the rear door and began lifting the truck by using the switch located at the rear of the truck--the one used to lift the truck to the loading dock at the kitchen--rather than the deadman switch located at the front of the truck. The door jammed, but Sanders continued to depress the button and raise the truck as he struggled to close the door. Ward yelled "Bob, Bob" right before the truck struck the plane, making a 27 inch gash in the fuselage.
 
 
 6
 Without giving him notice, Ogden terminated Sanders for willful misconduct on April 12, 1989. The company determined that Sanders willfully violated safety procedures because: 1) he began and continued to operate the lift before he had closed the back door, and 2) he used the wrong switch--the one in the back--to lift the truck. Ogden took no action against Ward, who is white. Sanders filed a grievance with the Union, and the Union argued before the Board of Adjustment in Sanders's favor. However, after hearing the company's evidence, the Union decided the termination was proper and did not pursue Sanders's grievance to arbitration.
 
 
 7
 Sanders sued the Union for breach of its duty of fair representation and sued both the Union and Ogden for race discrimination under Title VII and 42 U.S.C. Sec. 1981, as well as various state claims. The district court held the only state claim not preempted by section 301 of the National Labor Management Act was wrongful termination. It granted summary judgment to the defendants on all the remaining claims, and the plaintiff filed a timely notice of appeal on the grant of summary judgment.
 
 II.
 JURISDICTION AND STANDARD OF REVIEW
 
 8
 The district court had jurisdiction under 42 U.S.C. Sec. 2000e-5(f)(3) and 28 U.S.C. Sec. 1331. This panel has jurisdiction under 42 U.S.C. Sec. 2000e-5(j) and 28 U.S.C. Sec. 1291. The district court's grant of summary judgment is reviewed de novo. Jones v. Union Pac. R.R., 968 F.2d 937, 940 (9th Cir.1992). Summary judgment will lie if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c).
 
 III.
 DISCUSSION
 
 9
 A. Title VII race discrimination claim against Ogden.
 
 
 10
 1. Legal standard.
 
 
 11
 Sanders alleges that Ogden selectively enforced its termination policy against him because he is black. Thus, he proceeds under a Title VII disparate treatment theory. Generally, a plaintiff must make out the following prima facie case and show that: 1) he is in the protected class, 2) he was doing his job well enough to rule out the possibility that he was fired for inadequate job performance, and 3) the employer sought a replacement with similar qualifications, thus demonstrating a continuing need for the plaintiff's skills. Sengupta v. Morrison-Knudsen Co., 804 F.2d 1072, 1075 (9th Cir.1986).[1] Because Sanders was ostensibly fired for damaging an aircraft through his willful violation of safety policies, he must prove that Ogden does not terminate similarly situated white employees, in other words, white employees who willfully violate safety procedures. McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 283 (1976); Garrett v. City of San Francisco, 818 F.2d 1515, 1519 (9th Cir.1987).
 
 
 12
 2. No evidence that Ogden retains white employees but fires black employees who willfully violate safety standards.
 
 
 13
 Sanders could not point to any instances in which a black employee who willfully transgressed safety policies and damaged an airplane was fired and a white employee who did the same thing was not. No reasonable juror could find by a preponderance of the evidence that he is entitled to relief. Anderson v. Liberty Lobby, 477 U.S. 242, 252 (1986).
 
 
 14
 First, Sanders argues that Ward, his white coworker, was not disciplined. According to Sanders, Ward willfully violated safety procedures because, according to safety examinations, drivers, like Ward,[2] are "responsible for the truck's safe operation when in motion." Because the truck was stopped at the time of the accident, this argument fails.
 
 
 15
 Sanders points to three other accidents, which he claims bolster his case that Ogden terminated him on the basis of race. In the Granados/Williams accident, Williams was fired for failing to position the truck correctly and failing to warn the driver to stop raising the platform in time to prevent an accident.[3] Sanders argues for the first time on appeal that Ward and Williams were in analogous positions--both could see the upward motion of the platform and both failed to warn their partners in time to prevent the accident. However, Williams was fired and Ward was not. This discrepancy only bolsters Sanders's racial discrimination claim if Williams was black--a point on which the record is silent. Since the record does not state Williams's race, Sanders cannot raise this argument for the first time on appeal because the lower court could not have ruled on it. Whittaker Corp. v. Execuair Corp., 953 F.2d 510, 515 (9th Cir.1992).
 
 
 16
 Neither of the other two accidents supports Sanders's contention that Ogden selectively terminates black employees, but not white ones, for willful disregard of safety violations. The Salguero/Spiller accident happened when an untrained guide got out of position. Since the guide had not been trained, neither employee was disciplined.[4] Sanders contends that Spiller should have stopped his truck when he lost sight of the guide, but was not fired because he was white.[5] However, erring in a crisis situation is not the same as willfully disregarding safety procedures--Sanders initiated the lift procedure improperly.
 
 
 17
 The Duffy/Benefield accident also involved a truck which backed up and hit a plane. Neither white employee was fired because both were trying to comply with safety procedures. None of these accidents shows that Ogden selectively terminates black employees.
 
 
 18
 B. Title VII claim against the Union.
 
 
 19
 Sanders pursues a Title VII disparate treatment theory against the Union pursuant to 42 U.S.C. Sec. 2000e-2(c). He must show the Union refused to pursue his grievance to arbitration out of racial animus. See Goodman v. Lukens Steel Co., 482 U.S. 656, 667 (1987); Golden v. Local 55, Int'l Ass'n of Firefighters, 633 F.2d 817, 821 (9th Cir.1980).
 
 
 20
 As evidence of racial bias Sanders claims the Union arbitrated grievances on behalf of white employees discharged for comparably serious reasons. See McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 282 (1976) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804 (1973)). The only such evidence is one incident in which a white employee was fired for getting into a fist fight. Ogden terminated him for willful misconduct, and the Union pursued the claim to arbitration. This situation is not "comparably serious" to Sanders's. It did not involve an employee who intentionally disregarded a safety policy and damaged an aircraft. Since this is the only evidence of racial animus that Sanders can summons, his Title VII claim against the Union must fail.
 
 
 21
 C. 42 U.S.C. Sec. 1981 claims.
 
 
 22
 For a section 1981 racial discrimination claim, the plaintiff must make out the same prima facie case as is required under Title VII. Patterson v. McLean Credit Union, 491 U.S. 164, 186 (1989).[6] Since Sanders failed to show a prima facie Title VII case, he necessarily fails on his section 1981 claims as well.
 
 
 23
 D. Wrongful discharge claim.
 
 
 24
 Sanders also contends Ogden wrongfully discharged him in retaliation for reporting safety violations to OSHA.[7] Under Nevada state law, an employer who terminates an employee for seeking a safe and healthy work environment violates public policy and commits tortious discharge. D'Angelo v. Gardner, 819 P.2d 206, 212, 216 (Nev.1991). In D'Angelo, a worker with an open surgical wound refused to work near a cyanide pit and was fired for insubordination.
 
 
 25
 The facts here are very different from those of D'Angelo. Sanders contends that in December 1988 he filed an OSHA complaint because Ogden had failed to supply workers with boots and gloves in violation of the collective bargaining agreement.[8] Subsequently, OSHA apparently did inspect and cite Ogden, but the record--besides Sanders's contentions--does not say why it did so. Sanders says he told two Ogden employees, Wilda Jones, a purchasing manager, and "Miss Parsels," about his intention to file an OSHA complaint. However, the people who fired Sanders, Jim Otto and Jerry Roberts, said they did not know about his OSHA complaint filed four months earlier. C.R. 28, Deposition of Jim Otto at 14; E.R. at 19. Nothing in the record controverts this. Furthermore, the facts surrounding Sanders's willful violation of safety procedures are undisputed. No reasonable juror would find by a preponderance of the evidence that it was a retaliatory and pretextual discharge. Liberty Lobby, 477 U.S. at 252.
 
 
 26
 E. Union's duty of fair representation.
 
 
 27
 Sanders argues the Union breached its duty of fair representation when it failed to pursue his termination grievance to arbitration. A Union has breached its duty of fair representation only when its conduct toward a member is arbitrary, discriminatory, or in bad faith. Vaca v. Sipes, 386 U.S. 171, 190 (1967). Negligence by the union does not suffice to establish a claim. Peterson v. Kennedy, 771 F.2d 1244, 1253 (9th Cir.1985), cert. denied, 475 U.S. 1122 (1986).
 
 
 28
 As discussed previously, the Union did not discriminate against Sanders. Thus, Sanders must show the Union acted arbitrarily or in bad faith when it failed to go to arbitration on his behalf. He has shown neither. The Union was not required to take Sanders's grievance to arbitration. Section 18.03 Collective Bargaining Agreement; Vaca, 386 U.S. at 191. If a union investigates a grievance and concludes it does not have merit, the union has not acted arbitrarily. Id. at 194-95. This is so even if the union makes an error of judgment. Peterson, 771 F.2d at 1254.
 
 
 29
 Here, the Union did not act arbitrarily or in bad faith. It investigated the grievance and argued on Sanders's behalf before the Board of Adjustment. However, after hearing the evidence about Sanders's willful violation of safety rules, the Union concluded that Sanders's grievance lacked merit and it could not prevail at arbitration.
 
 
 30
 F. Sanctions for failure to serve excerpts of record.
 
 
 31
 The appellant has complied with Ninth Circuit Rule 30-1.2 which lists what must be included in the excerpts of record. Sanders did not include the final complaint and answer, but the final order clearly sets out the issues, so there was no need to include the pleadings. Ninth Circuit Rule 30-1.2(e).
 
 
 32
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Sanders argues that section 107 of the Civil Rights Act of 1991 changes the prima facie case for a disparate treatment claim. While the Civil Rights Act of 1991 applies retroactively to this case, Reynolds v. Martin, 985 F.2d 470, 471 (9th Cir.1993), section 107 does not change the Sengupta prima facie test for a disparate treatment claim
 
 
 [2]
 Ward was apparently the driver. However, formal designations of "driver" and "guide" do not clarify the analysis: both men drove trucks out to the plane; Sanders referred to Ward as the "guide" in his accident report; and Sanders performed the driver/operator's job--he operated the lift
 
 
 [3]
 Ogden says that Williams, like Sanders, operated the switch which raised the truck bed. However, the accident report shows that Williams did not operate the lift: "The guideman (Williams) was in a position to clearly view the upward motion of the body and platform. He did in fact motion the driver to raise the body when it could be seen that by so doing potential contact with the engine could occur." C.R. 34, Exhibit A
 
 
 [4]
 Sanders had no similar excuse. He had been with Ogden since 1982, and knew well the required procedures as evidenced by his responses on numerous safety examinations. Indeed, Sanders trained newly hired employees in the safety regulations
 
 
 [5]
 Spiller was fired after he was involved in another accident
 
 
 [6]
 This part of Patterson was not changed by the Civil Rights Act of 1991
 
 
 [7]
 Since Roberts conceded in deposition that the Union had no hand in his discharge, he cannot maintain a wrongful discharge action against it
 
 
 [8]
 Section 16.04 of the collective bargaining agreement states that: "The Employer shall furnish rubber aprons, boots, ear plugs and foul weather gear for any employee required to use steam or water hose or exposed to the weather." Sanders first went to the Union about the lack of boots, but the Union apparently did not think the complaint was worth pursuing. C.R. 28, Deposition of Johnny Lavoie at 33-34