Janet EICHELBERGER, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Office of Professional Employees International Union Local 2, Respondent-Intervenor.

No. 84-7210.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 18, 1985.

Decided July 9, 1985.

Paula B. Weiss, Portland, Or., for petitioner.

Joseph Oertel, N.L.R.B., Washington, D.C., Joseph E. Finley, Baltimore, Md., for respondent.

Before GOODWIN and SKOPIL, Circuit Judges, and VUKASIN,* District Judge.

VUKASIN, District Judge:

This case is before us on petition of Janet Eichelberger pursuant to Section 10(f) of the National Labor Relations Act, as amended, 29 U.S.C. §§ 151, 160(f) [the "Act"], for review of an Order of the National Labor Relations Board [the "Board"] dismissing her complaint alleging that respondent-intervenor Local 2 of the Office and Professional Employees International Union, AFL–CIO [the "OPEIU"] had violated Section 8(b)(1)(A) of the Act, 29 U.S.C.

§ 158(b)(1)(A), by breaching its duty of fair representation in its processing of a purported grievance lodged by petitioner. The Board's Decision and Order, issued on February 29, 1984, is reported at 268 NLRB No. 207.[1] We affirm.

### Factual Background

From September 7, 1977, until her resignation on October 13, 1981, Eichelberger was employed by the International Association of Machinists at its Northwest Regional Office in Portland, Oregon. She was represented by the OPEIU, and her employment with the Machinists was governed by a collective bargaining agreement.

Between October 7 and 10, 1981, petitioner was assigned to attend a Machinists staff conference in Seattle, Washington, where she assisted with conference registration. On Tuesday, October 13—the first working day following the conference—Eichelberger was summoned to the office of Fred Waggoner, assistant to her superior, who advised her that the Machinists Union was disappointed with her conduct at the conference. Waggoner accused petitioner of talking overmuch about union expenses, and of spending about half her conference time in a state of ebriety. Eichelberger denied these allegations. Nonetheless, Waggoner requested her resignation, which was forthcoming the same day.[2]

Local 2 of the OPEIU does not maintain a représentative in the Pacific Northwest. Petitioner therefore telephoned the Washington, D.C., offices of Leo J. Sheridan,

---

* The Honorable J.P. Vukasin, Jr., United States District Judge, Northern District of California, sitting by designation.

1. The Board had jurisdiction over the proceeding below under 29 U.S.C. § 160. The jurisdiction of this Court is based on § 160(f), the complained of conduct having occurred in Portland, Oregon.

2. On October 15, 1981, Eichelberger telephoned Waggoner, seeking a letter of recommendation and requesting her vacation and severance pay. Waggoner provided her with the desired recommendation, and the next day wrote Eugene Glo-

ver, the Machinists' general secretary-treasurer in Washington, D.C., informing him of Eichelberger's resignation and asking that she be provided with "everything she has coming." 268 NLRB No. 207 at 3. On October 19, petitioner also wrote Glover in connection with her request for severance pay. Ten days later, Glover replied to her letter, indicating that the bargaining agreement provided severance pay only for employees who were laid off for an indefinite period of time. Eichelberger having resigned voluntarily, severance pay was therefore not forthcoming. *Id.*

Local 2's President, on October 28, 1981. She asked a secretary how long she had in which to file a grievance and was advised that the operative period was 30 days from the date on which the grievance arose. On October 30, Eichelberger accordingly wrote Sheridan complaining, *inter alia,* of wages, sexual harassment, and wrongful termination; on page one she identified this communication as "Step 1 of the grievance procedure. . . ." Sheridan received this on November 2, 1981, read it several times, and concluded that her claims offered no basis for a grievance. He did not inform Eichelberger of this decision.

The period in which petitioner might have filed a grievance expired on November 12, 1981. On December 2, Eichelberger again wrote Sheridan, largely amplifying her prior charges and offering to provide supplemental details. Sheridan thereupon forwarded the documents pertaining to her claims to OPEIU's attorney, John R. Foley. After reviewing these, Foley advised Sheridan in writing that he detected no basis for a grievance. Again, Eichelberger was not apprised of Foley's conclusion. On January 25, 1982, petitioner's attorney wrote Sheridan demanding that he act on Eichelberger's behalf. No one from the OPEIU responded to this letter.

### The Board's Decision

On the basis of these facts, the Board determined that Sheridan fully considered petitioner's claims and that his decision that they were meritless was within his broad discretion and was not unreasonable. The Board further found that Sheridan's failure to timely notify Eichelberger of his refusal to pursue her grievance amounted to negligence; however, the Board rejected the conclusion of Administrative Law Judge ["ALJ"] Gordon Myatt that this negligence rose to the level of a Section 8(b)(1)(A) violation, finding instead that

**3.** The decision of the ALJ, filed May 27, 1983, was criticized by the Board for its restricted scope of inquiry. The Board found that the ALJ had improperly focused upon Sheridan's failure to furnish Eichelberger with timely notice of his decision not to process her grievance; this was

Sheridan's omission exhibited neither arbitrariness nor "something more than mere negligence." [3] 268 NLRB No. 207 at 10. Accordingly, the Board dismissed Eichelberger's unfair labor practice complaint.

### Discussion

#### 1. Standard of Review

The Board must be upheld if it correctly applied the law and its findings are supported by substantial evidence on the record viewed as a whole. *See, e.g., NLRB v. Nevis Industries, Inc.,* 647 F.2d 905, 908 (9th Cir.1981). Its interpretation of the National Labor Relations Act must be accorded considerable deference, *Ford Motor Co. v. NLRB,* 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979), and is entitled to affirmance upon a finding of substantial supporting evidence even if this court might reach a different conclusion based on the same evidence. *Nevis Industries, supra,* 647 F.2d at 908, *citing Stephens Institute v. NLRB,* 620 F.2d 720, 726 (9th Cir.), *cert. denied,* 449 U.S. 953, 101 S.Ct. 358, 66 L.Ed.2d 217 (1980). The Court, however, must not exclude from its consideration evidence contradictory to the Board's conclusions. *Nevis Industries, supra,* 647 F.2d at 908, *citing Stephenson v. NLRB,* 614 F.2d 1210, 1214 (9th Cir.1980). This standard does not change when the Board disagrees with prior ALJ findings; in this case, the latter are simply part of the record to be weighed against other evidence supporting the Board. *Stamper v. Secretary of Agriculture,* 722 F.2d 1483, 1486 (9th Cir.1984), *citing Saavedra v. Donovan,* 700 F.2d 496, 498 (9th Cir.1983); *NLRB v. Brooks Cameras, Inc.,* 691 F.2d 912, 915 (9th Cir.1982).

#### 2. Duty of Fair Representation

The duty of fair representation emanating from Section 8(b)(1)(A) of the Act

incorrect, the Board stated, because it ignored the totality of the circumstances presented by the case. Under this broader view, then, the Board ascertained that there had been no breach of duty. 268 NLRB No. 207 at 6–11.

was judicially recognized when courts and the NLRB inferred that

> when Congress empowered unions to bargain exclusively for all employees in a particular bargaining unit, and thereby subordinated individual interests to the interests of the unit as a whole, it imposed on unions a correlative duty "inseparable from the power of representation" to exercise that authority fairly.

*International Brotherhood of Electrical Workers v. Foust,* 442 U.S. 42, 46, 99 S.Ct. 2121, 2125, 60 L.Ed.2d 698 (1979), *citing Steele v. Louisville & Nashville R. Co.,* 323 U.S. 192, 202–04, 65 S.Ct. 226, 233, 89 L.Ed. 173 (1944). Thus, a union is required to represent fairly the interests of all members of the bargaining unit during negotiation, administration, and enforcement of collective bargaining agreements. *International Brotherhood of Electrical Workers, supra,* 442 U.S. at 47, 99 S.Ct. at 2125 (citations omitted). These principles must be interpreted in the context of the individual case. As the Fourth Circuit has observed:

> [t]he phrase "duty of fair representation" is a legal term of art, incapable of precise definition. [Citation omitted.] There is no code that explicitly prescribes the standards that govern unions in representing their members in processing grievances. Whether a union breached its duty of fair representation depends upon the facts of each case. [Citations omitted.]

*Griffin v. International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America, UAW,* 469 F.2d 181, 182 (4th Cir.1972). Generally speaking, however, the duty requires that the union avoid conduct that is "arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967).[4]

■ In the grievance area, a union may breach its duty when it arbitrarily ignores a meritorious grievance or processes it in a perfunctory fashion. *Id.* at 190–91, 87 S.Ct. at 917; *see also Tenorio v. NLRB,* 680 F.2d 598 (9th Cir.1982). In *Tenorio,* we explained:

> The thoroughness with which unions must investigate grievances in order to satisfy their duty varies with the circumstances of each case. Although we afford unions a reasonable range of discretion in deciding how best to handle grievances, union conduct that shows an egregious disregard for the rights of union members constitutes a breach of the duty of fair representation.

*Id.* at 601. While both intentional and unintentional conduct can constitute arbitrariness, *Robesky v. Qantas Empire Airways, Ltd.,* 573 F.2d 1082, 1089–90 (9th Cir. 1978), it has long been the rule—both in this circuit and elsewhere—that a showing of mere negligence in grievance processing is insufficient to constitute a breach of Section 8(b)(1)(A). *See, e.g., Clayton v. Republic Airlines, Inc.,* 716 F.2d 729, 732 (9th Cir.1983); *Tenorio, supra,* 680 F.2d at 601; *Stephens v. Postmaster General,* 623 F.2d 594, 596 (9th Cir.1980), *citing Motorcoach Employees v. Lockridge,* 403 U.S. 274, 301, 91 S.Ct. 1909, 1925, 29 L.Ed.2d 473 (1971); *Franklin v. Southern Pacific Transportation Co.,* 593 F.2d 899, 901 (9th Cir.1979); *Robesky, supra,* 573 F.2d at 1089–1090; *Dente v. Int'l. Org. of Masters, Mates, and Pilots, Local 90,* 492 F.2d 10, 12 (9th Cir.1973), *cert. denied,* 417 U.S. 910, 94 S.Ct. 2607, 41 L.Ed.2d 214 (1974). *Accord, Hoffman v. Lonza, Inc.,* 658 F.2d 519, 522 (7th Cir.1981); *NLRB v. American Postal Workers Union,* 618 F.2d 1249, 1255 (8th Cir.1980); *Buchanan v. NLRB,* 597 F.2d 388, 394 (4th Cir.1979); *General Truck Drivers Local 692 (Great Western Unifreight Systems),* 209 NLRB 446 (1974). As the Board stated in *Great Western,* "negligent action or nonaction of a union by itself will not be considered to be arbitrary, irrelevant, invidious, or unfair so

---

4. Petitioner grounds her arguments on the theory that Sheridan's conduct was arbitrary, or in "reckless disregard" of her right to grieve. Petitioner's Brief, at 16–17. It is not seriously alleged that his refusal to act on Eichelberger's behalf was motivated by bad faith or discriminatory intent, *Vaca v. Sipes, supra,* and we express no opinion as to this question.

as to constitute a breach of the duty of fair representation violative of the Act. *Something more is required." Id.,* at 447–48 (emphasis added).

This was the established and uncontroverted state of the law until the recent decision by a divided panel of this Circuit in *Dutrisac v. Caterpillar Tractor Co.,* 749 F.2d 1270, 113 LRRM 3532 (9th Cir.1983), an opinion which, although restricted by its very terms, is nonetheless vulnerable to the interpretation that negligence alone may henceforth breach the duty of fair representation.[5] Inasmuch as *Dutrisac* seemingly represents an abrupt divagation in the trend of authority, that case's potential applicability to the situation here must as a threshhold matter be assessed.[6]

It is our opinion that *Dutrisac* must be read as much for what that decision did not say as for what it did. The holding there extends no further than the novel principle that union negligence *may* violate Section 8(b)(1)(A) where *both* "the individual interest at stake is strong *and* the union's failure to perform a ministerial act completely extinguishes the employee's right to pursue his claim." *Id.* at 1274, 113 LRRM at 3535 (emphasis added). Little guidance is furnished with regard to the first criterion beyond the observation that an employee's interest in not being fired—the employer sanction at issue in *Dutrisac*—is strong. As to the second, and arguably more critical branch of the test, we construe *Dutrisac* as requiring that union negligence be the solitary and indivisible cause of the complete extinguishment of an employee's grievance rights. Absent an affirmative showing that both criteria have been satisfied, the question of whether union negligence has effected a breach of duty should not properly arise; even where there *is* such a showing courts and administrative bodies are not constrained to find a breach, but must carefully weigh the circumstances of each particular case in light of established principles of law.[7]

Subject, then, to these circumscriptions, the seeming aberrance of *Dutrisac* appears less inconsistent with previous case law. The foregoing analysis reveals too the inapplicability of *Dutrisac* to the facts here. While the net effect—loss of employment—is the same, the fact that petitioner voluntarily resigned dims somewhat the strength

---

5. In *Dutrisac* an employee discharged for alleged absenteeism filed a grievance claiming that his firing was in fact racially motivated. Finding the grievance meritorious, the business representative of the employee's local began processing. The employer rejected the grievance, allowing the union thirty days from the rejection date to request arbitration.

A request for arbitration was in fact filed, two weeks after expiration of the thirty day period. There was no explanation as to why the deadline had been missed. The arbitrator found the grievance untimely and therefore not arbitrable. *Id.,* 749 F.2d at 1272, 113 LRRM at 3535.

In reaching its decision that a breach of duty had occurred, the Court was specially concerned with the fact that the challenged employer conduct involved a discharge, and with the fact that the union's abrogation of its responsibility to pursue the grievance properly resulted in the total foreclosure of the employee's right to grieve. *See* further discussion *infra,* at pp. 854–55 and n. 7.

6. Our acknowledgement of *Dutrisac* must include recognition of the concurrence of Judge Norris, whose discomfort at the majority's seeming announcement of the "mere negligence" rule is shared by the present panel.

7. *Dutrisac* may further be limited to situations where a true ministerial act is involved. Where, however, what is implicated is conduct within the traditionally discretionary sphere of grievance evaluation, that decision should not properly apply. Indeed, language in *Dutrisac* specifically endorsed the established principle of judicial deferance to union expertise in this area, *id.,* 749 F.2d at 1273, 113 LRRM at 3534–35, *citing Rupe v. Spector Freight Systems, Inc.,* 679 F.2d 685, 691 (7th Cir.1982), and it is not unreasonable to read the case as subscribing to the venerable thesis that a union may in good faith forbear pursuit of a meritless grievance after due investigation and analysis. *Id.* at 1274, 113 LRRM at 3536; *see, e.g., Vaca v. Sipes, supra,* 386 U.S. at 190–192, 87 S.Ct. at 916–18. Because the panel which decided *Dutrisac* was presented with the negligent extinguishment of a potentially meritorious claim, we believe that the rationale of the case does not extend to situations, such as the one here, where having evaluated a claim the union determines it to be void of merit and thereafter fails to perform a ministerial act which—in the context of a meritorious grievance—could amount to a violation of Section 8(b)(1)(A).

of her interest. More importantly, subsequent analysis will demonstrate that while Sheridan's negligence may have conduced to an eclipse of Eichelberger's grievance rights it was not the sole cause of their complete extinguishment.

### 3. Application of the Foregoing

In this case, Sheridan received a letter from Eichelberger purporting to adumbrate a grievance. He read this several times and concluded that the document presented no grounds for setting in motion the grievance procedure. However, he did not notify petitioner of his adverse decision. The Board found that this failure to inform constituted negligence, and we agree. A determination of whether established facts constitute negligence is reviewed by the same standard as are findings of fact. *United States v. McConney*, 728 F.2d 1195, 1204 (9th Cir.) (*en banc*), *cert. denied*, —— U.S. ——, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). There is substantial evidence in the record to support the Board's finding of union negligence. What must now be determined is whether substantial evidence supports its reversal of the ALJ's decision that Sheridan's failure to act amounted to "something more" than mere negligence, i.e., arbitrary conduct violative of Section 8(b)(1)(A).[8] 268 NLRB No. 207 at 10; *see Great Western, supra*, 209 NLRB at 447–48.

The Board's view is expressed in its finding that Sheridan's inability to justify his failure to notify petitioner "means nothing more than that [he] was negligent." 268 NLRB No. 207 at 10. The ALJ had determined that Sheridan was aware of the imminent expiration of Eichelberger's right to grieve and that this, conjoined with his failure either to process the grievance or to inform her that he declined to do so, breached his duty of fair representation. To the Board, however, this position is vitiated by the finding that Eichelberger herself "was aware of the relevant time period . . . [but] took no action beyond her initial letter until well after the grievance period expired." *Id.* On this basis, the Board held that the ALJ had erred in concluding that petitioner lost her contractual rights *because of* Sheridan's inaction. Noting that ¶ XXIV of the Machinists' collective bargaining agreement clearly stated that either the Union *or the aggrieved employee* could file a grievance, the Board observed:

> Eichelberger knew of the applicable time limitations, yet she chose to take no action beyond asking the [union] to file a grievance for her. While Sheridan's omission is not to be condoned, it is also inaccurate and unjust to conclude that his conduct served completely to extinguish Eichelberger's contractual rights. Eichelberger herself must bear some responsibility for sleeping on her rights.

*Id.* at 10–11.

This conclusion is indeed supported by substantial evidence. Eichelberger was on notice of the terms of the agreement and was therefore in as good or better a position to pursue the grievance herself as to resort to the circuitous path of submitting her claims to the Washington office. That she elected to take the latter route does not mean that she could not have waged a coordinate campaign in her own behalf.[9] It must further be recalled that Eichelberger

---

**8.** We note initially that the approach of *Robesky*, 573 F.2d 1082, is inapposite to the facts here, since there is simply no showing that Sheridan acted in "reckless disregard" of petitioner's rights. There is substantial evidence to support the Board's finding that Sheridan's only excuse for his failure to inform Eichelberger of his adverse evaluation was the fact that he was preoccupied at the time with union litigation. There is, conversely, no evidence that he acted in bad faith, or that he harbored hostility toward petitioner or intended to prejudice her in any way. Although his negligent omission clearly constituted unintentional conduct within the ambit of *Robesky* the absence of reckless disregard means that that case cannot control.

**9.** Indeed, there is evidence that petitioner was a zealous defender of her perceived rights; as noted at p. 852 n. 2 *supra* she sought a letter of recommendation and aggressively pursued the severance pay which she believed was due her. That she acted to vindicate herself in these areas strongly suggests that she would also have been competent to lodge her grievance with the proper authorities, had she but elected to do so.

resigned on October 13, and did not formally submit the purported grievance to Sheridan's office until October 30; when her letter arrived on November 2 well over half the 30–day period had elapsed. While her dilatoriness in requesting union intervention cannot fully excuse the latter's silence, Eichelberger must surely have been aware that time was short, and that her case would either be handled expeditiously or not handled at all. As the November 12 deadline loomed she took no further action to forestall extinguishment of her rights but merely sat by, satisfied that word from Sheridan was nigh. It was not until December 2, well *after* the deadline date, that petitioner again contacted Sheridan, and then not to monitor the progress of her

claim, but to underscore and expatiate on the charges she had already made.

We agree with the Board's finding that Sheridan was nothing more than negligent in his handling of Eichelberger's purported grievance.[10] Because of this, the instant case is properly governed by well established legal principles, *see* authorities cited *supra*, at pp. 853–54, and not by the recent enlargement of the fair representation standard announced in *Dutrisac*.[11] Viewing the record as a whole, then, we find that substantial evidence supports the Board's finding that the facts of this case fail to disclose "something more" than mere negligence sufficient to constitute a breach of the OPEIU's duty of fair repre-

10. For much the same reason, we reject petitioner's alternate argument that the union was obligated to conduct an investigation before deciding not to pursue her grievance. While a violation of Section 8(b)(1)(A) may be found where a union processes a grievance in an arbitrary or perfunctory manner, *Tenorio, supra,* 680 F.2d at 601, we find nothing in the record to indicate that this was the case here. Sheridan read Eichelberger's letter several times before reaching his adverse conclusion, and later submitted all relevant documentation to Foley, whose perceptions coincided with his own. While this admittedly occurred after expiration of the grievance period, the concurrence of the two officials' assessments is notable.

The Board found that Sheridan "fully considered" petitioner's claims, and that his decision not to process them was "not unreasonable," falling as it did "within the [union's] broad discretion to process requests to file grievances as it deems appropriate." 268 NLRB 207 at 8, *citing Steelworkers Local 7748 (Eaton Corp.),* 246 NLRB 12 (1979). Substantial evidence supports this finding. A union is not required to process every grievance it receives. *Gregg v. Chauffeurs, Teamsters, and Helpers Union Local 150,* 699 F.2d 1015, 1016 (9th Cir. 1983). "To refuse to process a bad case is in itself not arbitrary. Such a refusal is most reasonable and in fact essential to the grievance and arbitration system." *Fountain v. Safeway Stores, Inc.,* 555 F.2d 753, 756–57 (9th Cir. 1977). Mindful of the policy mandating judicial deference to union decision-making activity in the grievance sphere, *see,* e.g., *Dutrisac, supra,* 749 F.2d at 1273–74, 113 LRRM at 3534–35 and discussion *supra* p. 855 n. 7, we conclude that whatever investigation may have been indicated by the facts of this case was sufficiently performed. Petitioner herself concedes that Sheridan "has had considerable experience in union

representation." Petitioner's Brief, at 7. Nothing before us betrays any indication that in the instant case he departed from the presumed skill imparted by that experience.

We further note that the emphasis petitioner places on *Tenorio,* 680 F.2d at 598, is misapplied. The ruling of that case finding a negligent failure to investigate on the part of the union was expressly limited to those particular circumstances. *Id.,* at 603. Those facts suggested that the union's failure to interview the discharged employees represented a departure from standard procedure potentially motivated by the fact that one of the parties to the subject altercation was a union official. There was thus a suspicion of a potential conflict of interest for the union in its handling of the grievance, as well as a related intimation that the grievance would be processed in a summary manner. *Id.,* at 602. *Tenorio* is therefore distinguishable from the instant case, where no such intimation arises, and where the OPEIU reasonably concluded that the employee's own version of the alleged grievance disclosed no meritorious claims.

11. We note in conclusion that, even under the seemingly more expansive standards of 8(b)(1)(A) violations announced in *Dutrisac,* petitioner's arguments would fail. It should be recalled that in *Dutrisac* the court was presented with the extinguishment by union negligence of a claim which the union had found meritorious. *See* discussion *supra* at p. 855 n. 7. Here, by contrast, Sheridan had expressly concluded that Eichelberger's "grievance" was insubstantial. Additionally, our finding that Sheridan's negligence was not the solitary and indivisible cause of the extinguishment of petitioner's grievance rights is enough, by itself, to remove this case from the scope of *Dutrisac.*

sentation under Section 8(b)(1)(A) of the National Labor Relations Act.

AFFIRMED.