Jeanne P. HERMAN, Plaintiff–Appellant,

v.

UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, LOCAL UNION NO. 971, et al., Defendants–Appellees.

No. 93–16819.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 15, 1995.

Decided June 21, 1995.

---

Joseph Dita, III, Reno, NV, for plaintiff-appellant.

Sandra Rae Benson (argued), Victor J. Van Bourg, Theodore Franklin, Van Bourg, Weinberg, Roger & Rosenfeld, San Francisco, CA, for defendants-appellees.

Before: FLETCHER, REINHARDT, and NOONAN, Circuit Judges.

REINHARDT, Circuit Judge:

When Jeanne Herman, a member of an office-worker's union, was abruptly terminated after 36 years of service, she brought suit against her employer, a local of the Carpenter's union, asserting a variety of claims. This appeal from a grant of summary judgment in favor of Herman's employer raises several questions: 1) Under what circumstances may a union member bring a breach of contract claim directly against her employer without exhausting grievance procedures under her collective bargaining agreement? 2) Under what circumstances may a union be deemed to have received federal financial assistance within the meaning of the Rehabilitation Act? 3) Under what circumstances does a union in its capacity as an employer fall within the reach of the federal Age Discrimination in Employment Act and the analogous Nevada employment discrimination statutes? and 4) Are certain common law tort claims preempted by the Labor–Management Relations Act or otherwise barred?

## BACKGROUND

Jeanne Herman, who is sixty-eight-years-old and suffers from lameness due to polio, was employed as a clerical worker by Local No. 971 of the United Brotherhood of Carpenters and Joiners of America. In 1991, she was summarily terminated from her job after more than thirty-six years of service and replaced by a twenty-year-old woman. Herman alleges that her termination was a result of age and handicap discrimination. She offers as proof of such discrimination several malicious comments allegedly made by her supervisor, Dana Wiggins, regarding

her age and handicap—for example, his reference to her as a "crippled old lady."

According to Herman, the events leading up to her termination are as follows: On June 20, 1991, Wiggins informed Herman that he wanted her to change her work schedule for the following day and work a 9-to-5 shift rather than her usual 7-to-3 shift. Herman said that she could not make the change because she planned to accompany her husband to a critical operation to be performed on his elderly mother. Wiggins then fired Herman effective the following day, saying, "Don't let the door hit you in the ass."

Within thirty days of this incident, Herman filed a grievance with her union, the Office and Professional Employees International Union, Local 29, in accordance with the grievance procedures outlined in the collective bargaining agreement between the OPEIU local and her employer, the Carpenter's local. Pursuant to that agreement, when the matter was not resolved at the initial stage, a Board of Adjustment was convened consisting of representatives from both Herman's union and the union-employer. After considering her claim, the Board of Adjustment decided to move the case to arbitration. The employer and the union then waived the contractually-established twenty-four-hour period for selecting the neutral chairperson or requesting a list of qualified arbitrators. Since they did so, despite the passage of a substantial period of time, neither the OPEIU local nor the union-employer has taken any action with respect to the claim.

Herman maintains that she contacted her union representatives on numerous occasions and urged them to process her grievance pursuant to the grievance procedures of the collective bargaining agreement. Finally,

when those efforts proved futile, Herman filed suit against her employer and, her supervisor, Dana Wiggins, in state court, but did not sue her union. Herman alleged the following nine claims: (1) violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634; (2) violation of the Nevada statute against employment discrimination based on, among other things, age and handicap; (3) violation of the Rehabilitation Act of 1973, 29 U.S.C. § 794; (4) wrongful discharge; (5) breach of contract; (6) breach of implied covenant of good faith and fair dealing; (7) intentional infliction of emotional harm; (8) negligent infliction of emotional harm; and (9) interference with prospective economic advantage. The defendants removed the action to federal court, and the district court granted summary judgment in their favor on all counts. Herman appealed. We review the grant of summary judgment de novo and affirm in part and reverse in part.

## ANALYSIS

### I. Breach of Collective Bargaining Agreement

The district court rejected Herman's breach of contract claim on the ground that Herman lacked standing because she had not exhausted the grievance procedures of the collective bargaining agreement.[1] The court stated, however, that although her breach of contract claim failed against her employer, Herman "may have a separate cause of action against her union for breach of the duty of fair representation." This statement evidences a fundamental misunderstanding of the applicable law. The district court erred in both its reasoning and its ultimate conclusion.

Herman brought a breach of contract action alleging a violation of the collec-

---

1. Under Section XVII of the collective bargaining agreement, Herman is required to file a written complaint within thirty days of the incident giving rise to the breach. The matter is considered by a representative of her union and of her employer, who attempt to resolve the dispute. If the matter remains unresolved three days after receipt of the written complaint, then the grievance is submitted to a Board of Adjustment, consisting of two union and two employer representatives. The Board is required to settle the

dispute by a majority vote within three days of receiving the complaint. If the Board is unable to resolve the matter within three days, then it is required to select a neutral chairman and reconstitute itself as a Board of Arbitration. If the union and employer representatives cannot agree on a neutral chairman within twenty-four hours, then they must request the Federal Mediation and Conciliation Service to provide a list of five qualified arbitrators. The Board then has twenty-four hours to choose one name from that list.

tive bargaining agreement by her employer.[2] Generally, an employee seeking a remedy for a breach of a collective bargaining agreement must attempt to exhaust any grievance and arbitration procedures established by that agreement prior to bringing suit. *Clayton v. International Union,* 451 U.S. 679, 680–82, 101 S.Ct. 2088, 2091, 68 L.Ed.2d 538 (1981). However, an employee need not do so if the employer repudiates those contractual procedures, or if the union breaches its duty of fair representation. *Vaca v. Sipes,* 386 U.S. 171, 184–86, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967). The district court stated that Herman may have asserted sufficient facts to bring an action for such a breach against her union. That is all that is necessary to overcome a motion for summary judgment premised on a failure to exhaust. If Herman can state facts sufficient to raise a genuine issue of material fact as to whether her union breached its duty of fair representation, then she may proceed to trial on her breach of contract action against her employer, even though she has elected not to join her union as a party. *See id.* at 187, 87 S.Ct. at 915. *See also Castaneda v. Dura–Vent Corp.,* 648 F.2d 612, 617–18 (9th Cir.1981).

█ We agree with the district court that the facts of Herman's case strongly suggest that her union breached its duty of fair representation. A union breaches that duty if its actions in resolving a union member's claim are "arbitrary, discriminatory, or in bad faith" toward that member. *Vaca,* 386 U.S. at 190, 87 S.Ct. at 916. This standard may be met when the union "arbitrarily ignores a meritorious grievance or processes it in a perfunctory fashion." *Eichelberger v. NLRB,* 765 F.2d 851, 854 (9th Cir.1985); *accord Vaca,* 386 U.S. at 191, 87 S.Ct. at 917.

█ Herman has raised a genuine issue of material fact as to whether the union breached its duty. Herman's affidavit demonstrates that her grievance was facially meritorious. She asserts that she was discharged in violation of the just cause provision of the collective bargaining agreement. Specifical-

ly, Herman's affidavit tells the story of a 64–year–old disabled woman who was abruptly fired after nearly 37 years of service. Her role as office manager was filled by a 20–year–old woman who appears to be underqualified. Herman also points to evidence that prior to her termination, her supervisor had told associates that he planned to eliminate "the old crippled lady."

Given the factual circumstances of her claim, it would be highly arbitrary for Herman's union to ignore her grievance or to simply let it languish in limbo. Moreover, the union's treatment of Herman's claim appears to rise above mere negligence because it failed to take action notwithstanding the continual prodding of Herman and her attorney, and because it failed to offer any explanation for its nonfeasance. Nothing in the record suggests that the union's failure to pursue the grievance resulted from a belief that the grievance was unmeritorious. Indeed, the union's decision to move the case to arbitration suggests the contrary. Before grinding to an unexplained and presumptively unwarranted halt, Herman's claim passed through two steps of the grievance process— joint consideration of Herman's written complaint by a union and an employer representative, and review by a Board of Adjustment containing two representatives of each entity. At both of these stages, the union representatives had the power, if the facts so warranted, to dispose of Herman's claim by agreeing with the employer representatives that the claim lacked merit. However, each time the union found sufficient substance to the claim to support its advancement to the next step.

█ We have long afforded unions a reasonable range of discretion in determining how best to handle grievances, and we will seldom find a breach of duty if a union evaluates and investigates a claim and determines it to be without merit. *See Eichelberger,* 765 F.2d at 854, 855 n. 7. However, where it appears that the failure to process a grievance results not from an exercise of good faith judgment but rather "an egregious

---

**2.** State law contract claims arising out of a breach of a collective bargaining agreement are preempted by federal law and supplanted by a federal claim under Section 301 of the Labor Management Relations Act. *See Young v. Anthony's Fish Grottos,* 830 F.2d 993, 998 (9th Cir. 1987).

disregard for the rights of union members," then a breach of duty may arise. *See id.* at 854. The union's wholly unexplained failure to take any action with respect to Herman's claim following the Board of Adjustment's decision to submit it to arbitration appears to fall into the latter category.

■ The facts as asserted by Herman raise a strong inference that the union has breached its duty, and the employer has pointed to nothing in the record which rebuts that inference. Assuming the facts in Herman's declaration to be correct, as we must for purposes of summary judgment, she has made a sufficient showing of a breach of the duty of fair representation to allow her to proceed directly against her employer on a breach of contract claim. Accordingly, we reverse the grant of summary judgment on that claim.

## II. Vocational Rehabilitation Act of 1973

■ Under the Vocational Rehabilitation Act of 1973, "any program or activity receiving federal financial assistance" is prohibited from discriminating against any individual on the basis of handicap. 29 U.S.C. § 794(a). Federal financial assistance can be direct or indirect. *Jacobson v. Delta Airlines, Inc.,* 742 F.2d 1202, 1211 (9th Cir.1984) (citing *Grove City College v. Bell,* 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984)). Herman's claim appears to raise a question of first impression, and she makes a novel argument in support of it. Neither party cites a case involving an attempted application of the Rehabilitation Act to a labor union, and our independent research has not revealed one.

Herman contends that the defendants are subject to the Rehabilitation Act because they receive federal financial assistance in one or more of the following ways: (1) union certification for exclusive bargaining representation granted by the National Labor Relations Board (NLRB), a federal agency; (2) federal assistance for union apprenticeship programs through the Department of Labor's regulation of those programs; (3) federal wage regulation protecting union wage rates under the Davis–Bacon Act, 40 U.S.C. § 276a; and (4) union access to the Federal Mediation and Conciliation Service. After reviewing each of Herman's contentions, we have determined that none supports a finding of federal financial assistance within the meaning of the Rehabilitation Act.

■ First, we agree with the district court that NLRB certification of bargaining groups is in certain respects analogous to a federal licensing scheme. Although the NLRB certification at issue here is not formally denominated a "license," we think that the analogy is a fair one. Generally a license is defined as:

> The permission by competent authority to do an act which, without such permission, would be illegal, a trespass, or a tort. * * * Permission to do a particular thing, to exercise a certain privilege or to carry on a particular business or to pursue a certain occupation.

Black's Law Dictionary 829 (5th ed. 1979).

Through NLRB certification, a union procures the right to act as the exclusive bargaining representative for employees in the bargaining unit. As the exclusive bargaining representative, the union may also obtain monetary remuneration from those employees in the form of dues or fees. Thus, through the certification process, the union receives power, prestige, and some financial reward. In some respects, an NLRB certification is similar to a license, even though essentially it simply recognizes the status that a union earns by securing formal authorizations and votes from a sufficient number of workers.

■ Although we conclude that certification is similar to licensing and although some federal licenses may, in turn, provide benefits that are as valuable as direct financial assistance, we have previously held that receipt of a federal license is insufficient to invoke application of the Act. *See Jacobson,* 742 F.2d at 1212–13. In *Jacobson,* the plaintiff argued that Delta airlines indirectly benefitted from the licensing certification services provided by the Federal Aeronautics Administration (FAA) for pilots and aircraft. We rejected this argument because we could find no indication that Congress intended the receipt of a federal license to place an entity within the

purview of the Rehabilitation Act. *Id.* We drew support for this conclusion from an extended analysis of the topic by the District of Columbia Circuit. *See Gottfried v. Federal Communications Comm'n,* 655 F.2d 297 (D.C.Cir.1981), *cert. denied,* 454 U.S. 1144, 102 S.Ct. 1004, 71 L.Ed.2d 296 (1982). Applying our reasoning in *Jacobson,* we conclude that NLRB certification does not constitute federal financial assistance within the meaning of the Rehabilitation Act.

Second, we reject Herman's attempt to equate federal regulation with federal financial assistance. Herman first points to the federal regulation of apprentices. Under 29 U.S.C. § 50, the Secretary of Labor is empowered to promote and regulate apprenticeship programs. Herman argues that as part of its constitution, the union has a goal to "encourage an apprenticeship program and a higher standard of skill," and that in pursuit of this goal, the union participates in a joint training and apprenticeship committee in the Reno area. Because the apprenticeship program in which the union participates is regulated by the federal government, Herman argues that the union indirectly benefits in the form of a higher skilled and higher paid membership.

■ Federal regulation standing alone is not equivalent to federal financial assistance.[3] The federal government promulgates a multitude of regulations each year, and it is highly doubtful that Congress intended that every program or entity subject to one of these regulations would also be subject to the Rehabilitation Act. Although there may be cases in which a regulation sufficiently benefits an entity or program so as to amount to "federal financial assistance" within the meaning of the Act, the link between the benefits purportedly received by the union and the federal regulation here is simply too tenuous.

■ Similarly, we must reject Herman's Davis–Bacon Act argument. The Davis–Bacon Act, 40 U.S.C. § 276(a), requires that public works contractors pay prevailing wages as determined by the Secretary of Labor. Herman argues that because one of the union's goals is to secure adequate pay for its members, the Davis–Bacon Act assists it in this goal. However, wage regulation under the Davis–Bacon Act is a benefit to employees generally, and confers no direct or indirect benefit upon the union. Even if it did, the fact that one benefits from the provisions of a benign or protective federal statute does not make one a recipient of federal financial assistance. Otherwise, all persons who receive the minimum wage from private employers would be deemed to be receiving such assistance, as would most if not all corporations and other businesses.

■ Finally, we reject Herman's remaining argument, regarding federal mediation services. Herman asserts that access to the Federal Mediation and Conciliation Service confers an indirect federal benefit on the union. This claim is analogous to the assertion in *Jacobson* that commercial airlines receive indirect federal financial assistance in the form of access to weather services and air traffic control services. *Id.* at 1213. Like weather services and air traffic control, federal mediation services benefit the public generally by assisting the free flow of commerce. *See* 29 U.S.C. § 173. In *Jacobson,* our inquiry focused on whether commercial airlines benefitted from these services to a substantially greater degree than the general public. We found that commercial airlines *did* benefit more than the general public, but concluded that the airlines also paid for these services to a greater degree than the general public. Accordingly, we found that those services did not constitute "federal financial assistance." 742 F.2d at 1213.

Here, the unions and employers are the direct beneficiaries of a federal service as were the airlines in *Jacobson.* However, while the airlines received valuable and necessary services that would otherwise have cost them substantial amounts to provide themselves, the benefits of federal mediation services are far more intangible. In the

---

**3.** Although Herman would possibly be on firmer ground if the apprenticeship program received some form of financial assistance from the government, even then it would be unlikely that the Rehabilitation Act would apply beyond the program actually receiving the federal assistance. See 29 C.F.R. § 32.2(a) (1993).

absence of federal mediation, it is not at all clear that unions or employers would seek the aid of another neutral party. Moreover, if they chose to do so, there are conciliation services available from a number of state and local agencies, as well as private organizations like the American Arbitration Association, at little or no cost to the users. More important, unlike the airlines, which all use federally subsidized weather and air traffic control services daily, an individual local union may use the services of the Federal Mediation and Conciliation Service only on rare occasions, if at all. Such occasional use would hardly constitute a sufficient justification for invoking the label "federal financial assistance." In *Jacobson*, the plaintiff made an extensive factual showing as to how the airlines used and benefitted from the services at issue. In contrast here, Herman has failed to offer any evidence that the defendant union *ever* utilized the federal agency for purposes of mediation or conciliation.[4]

For all these reasons, no genuine issue of material fact exists with respect to the Act's applicability to the local. In the end, all of Herman's arguments regarding the union's receipt of federal financial assistance fall short. Accordingly, we affirm the grant of summary judgment on the Rehabilitation Act claim.

### III. The ADEA & the Nevada Employment Discrimination Statutes

Both the Age Discrimination in Employment Act (the "ADEA") and the Nevada employment discrimination statutes contain statutory definitions of employers that limit the applicability of these acts to "employers" that have at least 20 and 15 employees respectively. 29 U.S.C. § 621–634; Nev.Rev. Stat. 613.310(1). Herman's employer, Carpenter's Local 971, had seven employees as of June 1991 when Herman was fired. Thus, a claim under either of these statutes appears to be unavailable to Herman. To overcome this hurdle, Herman offers two arguments: first, that a local union is simply a segment of the larger international union, and thus, the employees of all of the member locals should be aggregated for purposes of the statutory requirements; and second, that a labor organization is subject to the requirements of these Acts regardless of its number of employees. We reject both of these arguments.

■ Herman's first argument is analogous to the one presented in *Childs v. Electrical Workers, et al.,* 719 F.2d 1379 (9th Cir.1983). The plaintiff in *Childs* brought suit under Title VII which contains a definition of "employer" virtually identical to that in the ADEA, the difference being that under Title VII an entity is an employer if it has 15 employees while under the ADEA, the requirement is 20. The plaintiff in *Childs* argued that although her employer-local-union had fewer than the requisite 15 employees, the local and its International union should be treated as one entity. We adopted a four-part test to determine whether two employing entities constitute a single employer for purposes of Title VII. 719 F.2d at 1382. The factors to be considered are: 1) interrelation of operations; 2) common management; 3) centralized control of labor relations; and 4) common ownership or financial control. *Id.* Applying this test, we decided that the plaintiff had failed to establish that the local and the international union were a single employer. *Id.*

■ Recognizing that the *Childs* analysis is equally applicable to the ADEA context, Herman argues that her employer satisfies the standard because under the International constitution the International charters the local unions, receives dues from the locals, has the power to dissolve locals and receive their assets, has the power to impose trusteeships over locals and control their affairs, and because the constitution forbids locals to make rules which conflict with those of the International. However, this same argument was rejected in *Childs.* See 719 F.2d at 1382 n. 2. The features of the constitution pointed

4. While Herman does not urge the point on us, we note that the collective bargaining agreement provides that if the parties are unable to agree upon a neutral chairman for the Board of Arbitration, they will obtain a list of the names of five private arbitrators from the Federal Mediation and Conciliation Service. See n. 1. The occasional or even regular obtaining of such a list from the FMCS would in no way affect the analysis we have set forth in the text.

to by Herman are common in union constitutions and do not sufficiently evidence the type of inter-relationship between the day-to-day operations of the International and the local union required to meet the *Childs* standard.

Next, Herman argues that although the local union fails to meet the statutory definition of "employer," it is nonetheless covered by the Acts because it meets the statutory definition of a "labor organization."[5] The statutory definition for "labor organization" has no minimum number of employees requirement.

Although Herman's former employer may be subject in some respects to the provisions of the ADEA and the Nevada statutes because it qualifies as a "labor organization," these statutes set out separate prohibitions applicable to labor organizations and to employers. If an entity falls within the statutory classification of "employer," then it may be held liable for acts arising from its dealings with its employees. *See* 29 U.S.C. § 623(a). If an entity falls within the statutory classification of "labor organization," then it is subject to the statutory provisions governing its relations with its membership, or with the employers with whom it bargains or has contracts. *See* 29 U.S.C. § 623(c). Although there are some statutory provisions that apply to both "employers" and "labor organizations," the overall statutory schemes show that the classification of an entity will determine its basic legal responsibilities and areas of liability. This is not to say, of course, that an entity may not qualify as both a "labor organization" and an "employer." A union that has a sufficient numbers of employees meets the statutory test for "employer" and is thus an "employer" as well as a

"labor organization." Such a union is subject to the strictures applicable to both forms of entities.

The entity that Herman is suing, like all labor unions, has dual functions. In some contexts it functions as an employer, while in others it functions as a collective bargaining representative. Here, Herman is challenging acts performed by the Carpenter's local in its role as employer. Thus, in order to invoke the statutory constraints imposed on employers, Herman must show that the local meets the statutory definition applicable to such entities.

Herman cites two EEOC decisions which found that the commission had jurisdiction over a union in its capacity as an employer because it met the statutory definition of "labor organization," notwithstanding the fact that the union may have had too few employees to meet the statutory definition of "employer." *See* EEOC Dec. No. 71–57, 3 F.E.P. 94 (July 17, 1970); EEOC Dec. No. 7–3–336–U, 1 F.E.P. 909 (June 18, 1969). However, in the twenty-five years since those decisions, no federal court has adopted that view. Moreover, such a position would be inconsistent with our prior holding in *Childs*.

In *Childs*, we affirmed a district court's decision that it lacked subject matter jurisdiction over the defendant union because the union did not have a sufficient number of employees to meet the statutory definition of "employer." Implicit in this holding is the conclusion that jurisdiction over the particular action could not be derived from some other provision of Title VII, i.e. the "labor organization" provision. We read *Childs* to hold that when a union is being sued in its

---

5. Under the ADEA, "labor organization" is defined as follows:

> The term "labor organization" means a labor organization engaged in an industry affecting commerce, and any agent of such an organization, and includes any organization of any kind, any agency, or employee representation committee, group, association, or plan so engaged in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wage, rates of pay, hours, or other terms or conditions of employment * * *.

29 U.S.C. § 630(d).
The Nevada employment laws contain a similar provision:

> "Labor organization" means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment or other conditions of employment.

N.R.S. 613.310–4.

capacity as an employer, it must meet the statutory definition of "employer" rather than some other statutory provision. To the extent that any facet of this conclusion is merely implicit in *Childs*, we now make it express. Indeed, later cases have cited *Childs* with approval for this proposition, and similar approaches have been adopted by two other circuits and other lower courts. *See, e.g., Greenlees v. Eidenmuller Enter.*, 32 F.3d 197, 198–99 (5th Cir.1994) (citing *Childs* ) (In Title VII suit, capacity in which employment agency sued determines whether statutory definition of "employer" or "employment agency" applies); *Chavero v. Local 241, Division of the Amalgamated Transit Union*, 787 F.2d 1154, 1155 n. 1 (7th Cir. 1986) (Under Title VII, when a plaintiff attempts to hold a union liable in its employer capacity, the union must meet the "employer" definition like any other employer). *See also Schattman v. Texas Employment Comm'n*, 459 F.2d 32, 37–38 (5th Cir.1972), *cert. denied*, 409 U.S. 1107, 93 S.Ct. 901, 34 L.Ed.2d 688 (1973) (where state agency excluded from definition of employer, it is immaterial that the agency independently met definition of "employment agency"); *Brennan v. Paragon Employment Agency*, 356 F.Supp. 286 (S.D.N.Y.1973) (employment agency); *Shepherdson v. Local 401*, 823 F.Supp. 1245 (E.D.Pa.1993) (citing *Childs* ) (union); *Phelps v. Int'l Molders & Allied Workers*, 25 Fair Empl.Prac.Case. (BNA) 1164, 1166, 1981 WL 192 (D.Minn.1981) (union). In the absence of any contravening authority, we continue to believe that *Childs* reached the correct conclusion.

■ The local that employed Herman is being sued in its capacity as an employer. It does not have the number of employees required to qualify under the statutory definitions of "employer." Moreover, Herman has failed to demonstrate that the operations of the local union are sufficiently intertwined with those of the International union to warrant aggregating the number of employees of the two entities. Accordingly, we affirm summary judgment on the ADEA and Nevada statutory claims.

## IV. State Law Tort Claims

■ Herman seeks damages based on the following state tort claims: wrongful discharge; breach of implied covenant of good faith and fair dealing; intentional infliction of emotional harm; negligent infliction of emotional harm; and interference with prospective economic advantage. It is well-established that, under § 301 of the Labor Management Relations Act of 1947, a state law tort claim is preempted by federal law if its resolution substantially depends on an interpretation of the collective bargaining agreement. *See Allis–Chalmers v. Lueck*, 471 U.S. 202, 220, 105 S.Ct. 1904, 1915–16, 85 L.Ed.2d 206 (1985); *Miller v. AT & T Network Systems*, 850 F.2d 543, 548 (9th Cir. 1988).

■ Herman's claim for breach of an implied covenant of good faith and fair dealing is clearly preempted. Under Nevada law, this tort, also known as a bad faith discharge tort, requires an examination and evaluation of the reasonableness of the employer's behavior. *See D'Angelo v. Gardner*, 107 Nev. 704, 819 P.2d 206, 215 (1991). In the present context, an inquiry into whether an employer's behavior was reasonable generally necessitates inquiry into the terms of the collective bargaining agreement. *Miller*, 850 F.2d at 550. Here, the collective bargaining agreement provision prohibiting termination without "just cause" is coextensive with any implied covenant. Thus, interpretation of the collective bargaining agreement is required. *See Young v. Anthony's Fish Grottos*, 830 F.2d 993, 1000 (9th Cir.1987). Accordingly, Herman's state law claim for bad faith discharge is preempted.

■ As for the other claims, we need not address the preemption issue because the claims are unavailable under Nevada law. First, Herman's wrongful discharge claim is based on Nevada's public policy against age and disability discrimination. The Nevada Supreme Court has held that Nevada's public policy against impermissible discrimination cannot be vindicated through a tortious discharge public policy tort, but rather, must be pursued through statutory remedies. *Sands Regent v. Valgardson*, 105 Nev. 436, 777 P.2d 898, 900 (1989) (age discrimination). Second,

although Herman might have been able to establish a non-preempted emotional distress claim based on age and disability discrimination had the events occurred elsewhere,[6] she ultimately could not prevail here because we have construed Nevada law as precluding emotional distress claims in the employment context. *See Brooks v. Hilton Casinos,* 959 F.2d 757, 766 (9th Cir.1992). Third, Herman cannot survive summary judgment on her economic advantage claim because she has failed to allege any facts tending to show that she had a prospective contractual relationship with a third party. In this circumstance, there could be no showing of tortious interference.

In sum, all of Herman's state tort claims are either preempted by section 301 or the asserted cause of action is unavailable under the facts or under Nevada law. Therefore, we affirm summary judgment for the defendants on these claims.

## CONCLUSION

In light of the foregoing, we conclude that Herman has presented facts which, if true, are sufficient to establish that the union which is her collective bargaining representative breached its duty of fair representation, and that the union which is her employer breached the collective bargaining agreement. This showing enables Herman to overcome a summary judgment motion with respect to her claim for breach of contract against her employer, even though she has not exhausted the contractual grievance procedures and has not joined her union as a defendant. Thus, we reverse the district court's grant of summary judgment as to Herman's breach of contract claim. The district court did not err, however, in granting summary judgment in favor of the defen-

dants on the remainder of Herman's claims, and we affirm as to those counts.

REVERSED IN PART and AFFIRMED IN PART.

---

6. For example, in *Sever v. Alaska Pulp,* 978 F.2d 1529 (9th Cir.1992), the court found that Sever's emotional distress claims under state law were not preempted under § 301 because the termination was based on conduct not covered by the collective bargaining agreement. *Id.* at 1540–41. Sever was fired, in part, due to his testifying before Congress regarding the passage of new legislation. *Id.* at 1540. The employer's wrongful conduct was in no way regulated by the collective bargaining agreement and thus an emotional distress claim based on Sever's termi-

nation was not preempted under § 301. *Id.; see also Tellez v. Pacific Gas & Electric Co.,* 817 F.2d 536, 539 (9th Cir.), *cert. denied,* 484 U.S. 908, 108 S.Ct. 251, 98 L.Ed.2d 209 (1987) (emotional distress claim not preempted where the collective bargaining agreement was "silent" and "vague" regarding the conduct that formed the basis of the claim).